UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:

Plastech Engineered Products, Inc., et al.[1]        Case No. 08-42417
                                      Chapter 11
           Debtors.              Hon. Phillip J. Shefferly

                                        Jointly Administered

_____/

Chrysler LLC,

           Plaintiff,

v.                                        Adv. Pro. No. 08-4120

Plastech Engineered Products, Inc., et al.,

           Defendants.

_____/


**OPINION DENYING (1) MOTION TO LIFT THE AUTOMATIC
STAY; AND (2) MOTION FOR PRELIMINARY INJUNCTION**

I.  Introduction

This opinion addresses a motion to lift the automatic stay under § 362 of the Bankruptcy

Code filed by Chrysler, LLC and related entities (collectively "Chrysler"). The motion was heard

on February 14 and 15, 2008. The motion was opposed by the Debtor, many of its secured creditors

and the Creditors' Committee ("Committee"). A number of other parties also opposed some of the

_____

[1] The Debtors are the following entities: Plastech Engineered Products, Inc., LDM
Technologies, Inc., Plastech Frenchtown, Inc., Plastech Decorating Systems, Inc., Plastech
Exterior Systems, Inc., Plastech Romulus, Inc., MBS Polymet, Inc., LDM Holding Canada, Inc.
and LDM Holding Mexico, Inc.

relief requested by Chrysler, but not all of it. Chrysler called four witnesses to testify in support of its motion and introduced Chrysler's Exhibits 1, 4, 5, 6, 10, 12, 13, 16, 18-20, 22-29 and 32. Chrysler and the Debtor introduced Joint Exhibits 100 through 113. The Debtor called four witnesses in opposition to the motion to lift stay and introduced Debtor's Exhibits I, V and X. The Court finds that all of the witnesses testified credibly. The Court also received into evidence Goldman Sachs' ("Goldman") Exhibits 1 through 5. By agreement of Chrysler and the Debtor and pursuant to an order entered on February 7, 2008, the record made by the parties regarding Chrysler's motion for relief from stay also serves as the record for Chrysler's motion for injunctive relief filed by it against the Debtor in adversary proceeding no. 08-4120. The Court has carefully considered the many briefs filed by Chrysler, the Debtor and various other parties in this case, as well as the testimony of the eight witnesses and the exhibits introduced into evidence. The following constitutes this Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052 both with respect to the motion to lift stay in the bankruptcy case and the motion for injunctive relief in the adversary proceeding.

## II. Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), and (K).

## III. Facts

Plastech Engineered Products, Inc. is a privately held entity engaged in business as a tier one automobile supplier and designer and maker of blow-molded and injected-molded plastic products primarily for use in the automotive industry. It has a number of subsidiary entities engaged in business in the same industry. (Plastech and its subsidiaries will be collectively referred to as the

"Debtor.")  The Debtor is the largest female owned company in Michigan and it is certified as a minority business enterprise by the State of Michigan.  The Debtor has been in business since 1988.  Its products include automotive interior trim, under-hood components, bumper and other exterior components and cock-pit modules.  The Debtor's major customers are General Motors ("GM"), Ford Motor Company, Chrysler, and Johnson Controls, Inc. ("JCI") (collectively referred to as the "Major Customers").  The Debtor has 36 manufacturing facilities in North America and 2 corporate locations.  The Debtor employs over 7,700 individuals.  The Debtor's annual sales are approximately $1.2 billion to $1.3 billion.  The Debtor has basically three levels of financing.  There is a revolving credit facility with various lenders (collectively referred to as "Revolving Lenders").  There are first and second lien term loans involving various lenders (collectively referred to as "First Lien Term Lenders" and "Second Lien Term Lenders").

Recent developments in the domestic automotive market combined with the rising prices of certain commodities have put a strain on the Debtor's liquidity position in recent years.  Further, the decline of overall sales in the domestic automotive industry has created certain over capacity in the automotive industry worldwide, resulting in increased competition among automotive suppliers such as the Debtor, intensifying the pressure upon them to remain competitive.

In February, 2007, the Debtor entered into a refinancing that created the revolving credit facility, the first lien term loan and the second lien term loan.  Goldman served as the lead arranger, syndication agent and administrative agent for the refinancing.  The revolving credit facility provided the Debtor with up to $200,000,000 of revolving credit subject to a formula and available collateral.  The first lien term loan provided the Debtor with up to $265,000,000 of secured term debt.  The second lien term loan provided the Debtor with up to $100,000,000 of additional secured

term debt.

To assist it in obtaining the refinancing, the Debtor received commitments from the Major Customers to provide the Debtor with certain financial accommodations. On February 12, 2007, the Debtor entered into a Financial Accommodation Agreement ("First Accommodation Agreement") (J. Ex. 104) with the Major Customers. The recitals to the First Accommodation Agreement stated that the Debtor had advised the Major Customers that it was attempting to effectuate a refinancing, that Goldman was serving as the lead arranger, syndicate agent and administrative agent for the refinancing, that the Debtor needed the Major Customers to provide certain financial accommodations in order to obtain the refinancing, and that the Major Customers agreed to provide such financial accommodations by depositing funds in an account with Goldman to be released to the Debtor simultaneously with the closing of the refinancing. The First Accommodation Agreement provided that the Major Customers would deposit $46,000,000 in the account with Goldman. That $46,000,000 was allocated among the Major Customers based on their respective levels of production of parts by the Debtor. Chrysler's share was $6,900,000. This was not an advance payment on any accounts receivable owing by Chrysler to the Debtor, nor was it a payment that Chrysler was contractually obligated to make to the Debtor. Instead it was a deposit provided by Chrysler to contribute to the Debtor's liquidity and enable the Debtor to obtain the refinancing. In exchange for this accommodation, the Debtor provided the Major Customers with various rights under the First Accommodation Agreement.

By the time the parties entered into the First Accommodation Agreement, the Debtor had been transacting business with Chrysler for approximately ten years. At that time, Chrysler's business was approximately 13% of the Debtor's overall sales volume and approximated

-4-

$200,000,000 annually. Over that ten year period, Chrysler had paid the Debtor approximately

another $167,000,000 for tooling. The Debtor produced approximately 500 component parts for

Chrysler using approximately 3,000 tools. The parts include interior, exterior and power train

components. When the First Accommodation Agreement was made, there already existed several

executed documents governing the relationship between Chrysler and the Debtor. Chrysler's

standard purchase order (Chrysler's Ex. 1) contains certain terms and conditions and also references

and incorporates Chrysler's general terms and conditions and provides the Internet address to

Chrysler's website on the face of the purchase order to refer to those general terms and conditions.

The general terms and conditions (J. Ex. 100) provide in paragraph 1 that the purchase of goods by

Chrysler from a supplier is governed both by the purchase order and the general terms and

conditions. Paragraph 20 of the general terms and conditions authorizes Chrysler to terminate any

or all of its purchase orders with the Debtor, at Chrysler's option, without cause, upon 30 days

written notice to the Debtor. Paragraph 21 of the general terms and conditions authorizes Chrysler

to cancel any or all of its purchase orders in the event of certain specified defaults, some of which

require 10 days written notice, but others of which do not require any written notice.

In addition to Chrysler's standard purchase orders and its general terms and conditions, on

August 30, 2006, Chrysler and the Debtor entered into a long term productivity agreement (J. Ex.

101) that states that the Debtor and Chrysler "wish to supplement their existing contractual

relationships with a long term productivity agreement" that would remain in effect until December

31, 2008. On the same day as the refinancing and the First Accommodation Agreement, February

12, 2007, Chrysler and the Debtor entered into an amended long term productivity agreement (J. Ex.

102). Like the original long term productivity agreement, the amended agreement provided that it

would remain in effect through December 31, 2008.     However, the amended long term productivity agreement contained a new provision in paragraph 2 stating that Chrysler "may not terminate for convenience."  Paragraph 7 of the amended long term productivity agreement also added a provision allowing Chrysler to "resource" certain programs "immediately upon the occurrence of any Plastech responsible crisis."  Both the original and the amended long term productivity agreements state that they prevail in the event of a conflict between them and the terms of any specific purchase orders.

The First Accommodation Agreement (J. Ex. 104) contains a provision that is not in the purchase orders, the general terms and conditions or either of the long term productivity agreements.  Specifically, in exchange for the financial accommodations made by the Major Customers, the Financial Accommodation Agreement grants them certain rights in the tooling used in the Debtor's manufacture of components parts for the Major Customers.  Section 4.0 of the First Accommodation Agreement is titled "Tooling Acknowledgment."  It states as follows:

> Plastech acknowledges and agrees that exclusive of Unpaid Tooling (as defined below) all tooling, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications, PPAP books, and test reports together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto (collectively, "Tooling") used by Plastech in connection with its manufacture of component and service parts for each Major Customer (collectively, the "Major Customer Owned Tooling") are owned by the respective Major Customers (or a customer of the Major Customers in the case of JCI) and are being held by Plastech or, to the extent Plastech has transferred the Major Customer Owned Tooling to third parties, by such third parties, as bailees at will. Upon payment in full of the applicable purchase order price for any item of Unpaid Tooling such item shall thereafter be included in the definition of the Major Customer Owned Tooling under this Agreement; provided, however, that nothing in this Agreement is intended to modify any of the respective Major Customers' obligations to Plastech on account of Unpaid Tooling.  For purposes of this Agreement, the term "Unpaid Tooling" means (i) Tooling for which the applicable Major Customer has not paid the applicable purchase order price for such Tooling to either Plastech or any of its

-6-

predecessor(s)-in-interest or (ii) Tooling in respect of which Plastech has performed engineering or other related work pursuant to an engineering work order issued by the involved Major Customer to Plastech on and after June 30, 2006 and in respect of which Plastech has performed work subsequent to June 30, 2006 and for which Plastech has not been paid by the Major Customer. For the avoidance of doubt, any claims relating to unpaid engineering work order(s) or related claims for Tooling arising prior to June 30, 2006 are waived by Plastech.

Neither Plastech, nor any other person or entity other than the Major Customers have any right, title or interest in the Major Customer Owned Tooling other than Plastech's obligation, subject to the Major Customers' respective unfettered discretion, to utilize the Major Customer Owned Tooling in the manufacture of the Major Customers' component and service parts. The Major Customers and their respective designee(s) shall have the right to take immediate possession of the Major Customer Owned Tooling at any time without payment of any kind from the Major Customers to Plastech should the Major Customers elect to exercise such right, and Plastech agrees to cooperate with each of the Major Customers in their taking possession of their respective Major Customer Owned Tooling, including allowing access to Plastech's facilities. The rights and obligations contained in this Section shall continue notwithstanding the expiration or termination of this Agreement.

In the event of a dispute between Plastech and a Major Customer over whether any Tooling is Major Customer Owned Tooling or Unpaid Tooling, the Tooling subject to the dispute will be presumed to be Major Customer Owned Tooling pending resolution of the dispute, and the Major Customer will have the right to immediate possession of the Tooling pending resolution of the dispute (and Plastech may not withhold delivery of possession of the Unpaid Tooling to such Major Customer pending such resolution), but will remain subject to any claim or right to payment of Plastech for the disputed amounts (despite Plastech's relinquishment of possession). The rights and obligations contained in this Section 4.0 are in addition to (and not in lieu of) the rights of each Major Customer in its respective purchase orders, including its respective global terms and conditions, and other agreements with Plastech, and will continue in effect notwithstanding the expiration or termination of this Agreement.

Obtaining this tooling acknowledgment was very important to Chrysler and the other Major Customers. Even though Chrysler's standard tooling purchase orders provide in clause 14 that the tooling used by a supplier to make parts for Chrysler "become Chrysler's property" once Chrysler pays for the tooling (Chrysler's Ex. 1 at p.5), the tooling acknowledgment contained in the First

Accommodation Agreement goes much further. It provides Chrysler with several additional benefits. First, it contains the Debtor's statement that neither the Debtor nor any other party has an interest in the tooling that Chrysler has paid for. Second, it provides Chrysler with the right to demand immediate possession of the tooling paid for by Chrysler when Chrysler "elect[s] to exercise such right" and requires the Debtor to cooperate with Chrysler in taking possession of such tooling, including allowing access to the Debtor's facilities. Finally, in the event that there is a dispute over whether tooling is paid or unpaid, the tooling acknowledgment permits Chrysler to take possession of such tooling while any dispute over payment for it is being resolved. The tooling acknowledgment in the First Accommodation Agreement granted each of the Major Customers the same rights with respect to the tooling used by the Debtor to make their respective parts.

In late 2007, the Debtor again approached the Major Customers for the purpose of requesting additional financial accommodations. By this time, Chrysler had engaged BBK, a financial consulting firm, to monitor the Debtor's financial condition and to provide Chrysler with advice. The Debtor had also engaged its own financial consultant Conway MacKenzie & Dunleavy ("CMD") to negotiate with the Debtor's Major Customers and lenders regarding the Debtor's liquidity problems and to advise the Debtor regarding various financial restructuring possibilities. In December, 2007, the Debtor requested that Chrysler agree to an advance of its payables, which Chrysler declined to do. By this time, Chrysler was concerned about the Debtor's financial condition causing an interruption of Chrysler's production based upon information provided to Chrysler by BBK. BBK expressed concern to Chrysler that the Debtor was not paying its suppliers on a timely basis and may have been in breach of certain financial covenants with its lenders.

In January, 2008, as the Debtor's liquidity crisis became more acute, the Debtor entered into

further discussions with the Major Customers concerning additional financial accommodations. During the course of these discussions, Chrysler's attorney sent a letter to the Debtor dated January 15, 2008 (J. Ex. 108) that asserted that the Debtor was in breach of the amended long term productivity agreement, as well as Chrysler's purchase orders and general terms and conditions. The letter contained seven separately numbered paragraphs describing the breach. Among the specific assertions were that the Debtor failed to meet certain quality obligations, failed to pay tooling suppliers, requested payment in advance of payables owing by Chrysler, planned certain plant closures placing Chrysler production at risk, objected to warranty claims, and experienced a "material adverse change" in its financial condition. The following day, January 16, 2008, Chrysler's attorney sent a follow-up letter (J. Ex. 109) advising that the defaults specified in the January 15, 2008 letter, together with the Debtor's "current financial condition and accommodation requests" constitute a "Plastech responsible crisis under paragraph 7 of the Amended Long Term Productivity Agreement." The Debtor did not respond to the asserted breaches in either of these two letters.

Notwithstanding its letters of January 15 and 16, 2008, and its concerns over the Debtor's financial condition, Chrysler did enter into a Second Financial Accommodation Agreement ("Second Accommodation Agreement") (J. Ex. 106) with the Debtor and the other Major Customers on January 22, 2008. The Second Accommodation Agreement recited that the Debtor had advised the Major Customers that it may face certain financial problems that may cause an interruption in the production of component parts for the Major Customers unless it received accommodations from them. It further stated that the Debtor had advised the Major Customers that it was seeking an out of court resolution to its liquidity crisis but that it might also need to file for relief under Chapter 11

-9-

of the Bankruptcy Code. The Second Accommodation Agreement further recited that the Debtor

needed additional time to negotiate an out of court workout and/or to prepare for a bankruptcy filing,

including obtaining and documenting a debtor in possession loan. Finally, the Second

Accommodation Agreement stated that the Debtor would be out of formula under its revolving line

of credit and therefore would need the Major Customers to "pull ahead" payment of $40,000,000

of payables owing by them to the Debtor, including an advance of payables that were not yet due

totaling $33,400,000. The Debtor represented to the Major Customers that if it could obtain these

accommodations, it had received "reasonable assurances" from the Revolving Lenders that they

would continue to lend under the revolving credit facility. The Second Accommodation Agreement

had a very short funding term which commenced on January 22, 2008 and expired on January 31,

2008. Chrysler's share of the payable advance required under the Second Accommodation

Agreement was $10,700,000 which was paid on execution of the agreement.

Like the First Accommodation Agreement (J. Ex. 104) entered on February 12, 2007, the

Second Accommodation Agreement also contained a tooling acknowledgment. Section 4.5 of the

Second Financial Accommodation Agreement provided that "Plastech acknowledges and affirms

the 'tooling acknowledgment' set forth in Section 4.0 of the Financial Accommodation Agreement

between the parties dated February 12, 2007." (J. Ex. 106 at p.4.) The balance of the tooling

acknowledgment in Section 4.5 of the Second Accommodation Agreement tracks almost verbatim

the tooling acknowledgment in Section 4.0 of the First Accommodation Agreement. Both

documents contained an acknowledgment by the Debtor that the Major Customers owned the tooling

that they had paid for, would become the owners of any unpaid tooling upon payment thereof, and

would have the "right to take immediate possession of the Major Customer Owned Tooling at any

time." Both documents also provided that in the event of a dispute between the Debtor and a Major Customer over whether tooling is "Major Customer Owned Tooling or Unpaid Tooling," the tooling subject to the dispute would be presumed to be owned by the Major Customer and the Major Customer would have the right to immediate possession of the disputed unpaid tooling pending resolution of the dispute. It was because of the tooling acknowledgment that Chrysler agreed to the financial accommodations required of it in both the First Accommodation Agreement made on February 12, 2007, and the Second Accommodation Agreement made on January 22, 2008.

After the parties entered into the Second Accommodation Agreement, the Debtor continued discussions with the Major Customers and with its lenders regarding its liquidity difficulties and financial condition. By this time, Chrysler had received information from BBK that the Debtor was insolvent and unable to pay its bills, and was unable to make component parts in the ordinary course of its business without obtaining further financial accommodations from Chrysler. During the term of the Second Accommodation Agreement there were several restructuring alternatives being discussed by the Debtor with its Major Customers and lenders. Plan "A" would involve some kind of strategic business combination, merger or acquisition as a going concern. These discussions were mostly between the Debtor and JCI. JCI was by far the largest customer of the Debtor. Discussions were also held regarding a plan "B." Plan "B" was a stand alone restructuring that would involve making significant cost reductions to the Debtor's operations and might involve a de-leveraging of the balance sheet, including a debt for equity swap with certain of the Debtor's lenders. Plan "B" might also include additional cash from some combination of existing stakeholders or third party investors. In the event that plan "A" or plan "B" did not materialize, the Debtor and its advisors would consider plan "C" consisting of an orderly liquidation.

-11-

During the short time that the Second Accommodation Agreement was in effect, the Debtor continued to engage in discussions with the Major Customers regarding each of the restructuring alternatives. CMD also had discussions with possible investors. During the meetings in this time frame among the Debtor and the Major Customers, BBK and CMD each prepared various analyses of the Debtor's financial condition and possible restructurings and shared them with each other as well as with the financial advisors for the other Major Customers. BBK's draft analysis for these discussions (Chrysler's Exs. 10 and 12) projected approximately $61,000,000 of earnings before income tax, depreciation and amortization ("EBITDA") for the Debtor for 2008. CMD was projecting approximately $85,000,000 of EBITDA for the Debtor for 2008. In either case, the projected EBITDA would be insufficient to comply with covenants that the Debtor had with its lenders that required $100,000,000 of EBITDA for the Debtor for 2008. In addition to identifying this failure to comply with a financial covenant, BBK was also advising Chrysler that the Debtor appeared to be insolvent in January, 2008. The Debtor's cash management worksheets for the critical days during the last week of January, 2008 (Chrysler's Ex. 13) showed that the Debtor had net outstanding checks during each of those days in excess of the actual credit line available to it, although on each of those days it appears that the checks scheduled to clear on a given day were less than the cash available for such day. The Debtor maintained that it was not insolvent at that time. Although differing on whether the Debtor may have become insolvent at this point, there is no dispute that the Debtor was experiencing significant liquidity difficulties that were becoming more critical by the day.

The Debtor continued its discussions with the Major Customers during the last week of January in an effort to induce them to provide further financial accommodations. A draft of a Third

Financial Accommodation Agreement ("Third Accommodation Agreement") (Debtor's Ex. I) was prepared, circulated and discussed by the Debtor with the Major Customers. The draft of the Third Accommodation Agreement again contained recitals that the Debtor had advised the Major Customers that it was facing certain financial problems that may cause an interruption in the production of component parts for them unless the Debtor received additional financial accommodations from the Major Customers. The draft recited that the Debtor was seeking an out of court resolution to its liquidity crisis but also warned that the Debtor may need to seek protection under Chapter 11 of the Bankruptcy Code. The draft of the Third Accommodation Agreement provided that each Major Customer would have to agree to accelerated payment terms to help ease the Debtor's liquidity crisis and clearly stated that without such accommodations the Debtor would be out of formula under its revolving lending facility. The draft further stated that the Debtor had now entered into discussions with its lenders to attempt to obtain from them a forbearance agreement whereby they would agree to continue in formula lending to the Debtor and to otherwise forbear from enforcing their rights and remedies. The agreement of the lenders to the forbearance hinged upon the Debtor's ability to obtain the further financial accommodations from the Major Customers. The draft of the Third Accommodation Agreement provided for a request for forbearance from the lenders until April 15, 2008, during which time the Debtor would embark upon a sale process with milestones set along the way for the development of a written proposal by the Debtor to the Major Customers and a deadline for submission of definitive documents acceptable to the Major Customers, the Debtor and the lenders with regard to a restructuring transaction. The time frame was tight and it provided for forbearance with a closing on a transaction to occur prior to April 15, 2008.

-13-

The draft of the Third Accommodation Agreement was never executed. During the last week of January, 2008, the Debtor and the Major Customers exchanged numerous emails (Chrysler's Exs. 22 through 29) negotiating the various open issues among them. The financial advisors for the Debtor and its Major Customers participated in these discussions and CMD continued to prepare and circulate drafts of terms sheets and other financial information (Chrysler's Exs. 20 and 22) for discussion at these meetings.

During these meetings and discussions between the Debtor and the Major Customers, the Debtor requested that the additional accommodation of funds be received by no later than February 4, 2008, because the Debtor's cash flow showed that it would be out of funds at that time. If the Debtor could get the additional funds from the Major Customers, the Debtor was confident that it could obtain a forbearance agreement with its lenders, although it still had not yet obtained their commitment to a forbearance agreement. Time was running out because the Second Accommodation Agreement was expiring, the Debtor was running out of cash, the lenders' forbearance had not been obtained, and a real threat of interruption of production existed. Unfortunately, the meetings did not result in an agreement. Despite the efforts of the Debtor and the Major Customers, there were still open issues unresolved among them at the time that the Second Accommodation Agreement expired on January 31, 2008.

On Friday morning, February 1, 2008, Larry Walker, the director of exterior procurement for Chrysler, delivered a letter (J. Ex. 107) to the Debtor. The letter was addressed to Julie Brown, CEO and was hand delivered at the Debtor's office. Ms. Brown was not present and the letter was delivered to another employee. The February 1, 2008 letter read as follows:

Dear Ms. Brown:

Please be advised that effective immediately, Chrysler is terminating all purchase orders and supply agreements with Plastech, including, but not limited to, the Amended Long Term Productivity Agreement dated February 12, 2007 in accordance with the terms thereof and the letters previously sent by our counsel to Mr. Scott dated January 15, 2008 and January 15, 2008. As required by Chrysler's General Terms and Conditions and the Second Financial Accommodation Agreement dated January 22, 2008 and Financial Accommodated Agreement dated February 12, 2007, please make all tooling associated with Chrysler's production available to it for immediate pick-up and otherwise cooperate with Chrysler in its taking possession of the same.

Very truly yours,


Larry Walker
Director-Exterior Procurement
Chrysler LLC

Douglas Doran, the director of interior purchasing for Chrysler who was responsible for purchasing interior components from the Debtor, participated in the decision to terminate Chrysler's relationship with the Debtor and send the February 1, 2008 letter. Chrysler's decision went back to the First Accommodation Agreement in February, 2007, when Chrysler essentially gave $6,900,000 to the Debtor that Chrysler was not contractually obligated to give. When the Debtor requested further financial accommodations from Chrysler in December, 2007, "red flags" were going up at Chrysler. BBK was advising Chrysler at that time that the Debtor's condition was deteriorating. By the middle of January, BBK was advising Chrysler that the Debtor was insolvent. Chrysler looked at the draft of the Third Accommodation Agreement and the Debtor's proposals and concluded that it would have to put in another $60,000,000 and perhaps up to $100,000,000 over the next four years. This was coming on the heels of a $1.6 billion loss in 2007 by Chrysler and Chrysler's decision was influenced greatly by the recent experience it had with the bankruptcy case

of Collins & Aikman in which Chrysler had put in $400,000,000 in accommodations for the troubled supplier. In sum, Chrysler perceived the Debtor to be in a "meltdown" and determined that it would be less costly to Chrysler to implement its own plan "B" by moving its tooling from the Debtor to other suppliers to resource the parts previously made by the Debtor for Chrysler. Chrysler understood in making this decision that there would be an initial interruption in its parts supply while it removed the tooling from the Debtor and resourced the parts to other suppliers. However, Chrysler had concluded that this initial interruption, although resulting in the shut down of certain of Chrysler's plants and the idling of substantial numbers of employees, would ultimately be less costly than continuing to provide financial accommodations to the Debtor and continuing its relationship with the Debtor.

Immediately after delivering the letter, Chrysler filed suit against the Debtor in Wayne County Circuit Court and obtained an ex parte temporary restraining order and order of possession that required the Debtor to immediately deliver possession of all of the tooling that it utilized in the production of Chrysler's parts, allow Chrysler immediate access to the Debtor's facilities to inspect, load, remove and transport the tooling, and to provide all reasonable and necessary assistance to Chrysler to take possession of the tooling. The restraining order was signed on Friday, February 1, 2008 at 3:35 p.m. Later that same day, the Debtor filed this Chapter 11 case.

On the next day, Saturday, February 2, 2008, Chrysler filed a motion for relief from the automatic stay so that it could be permitted to immediately enter onto the Debtor's premises and remove the tooling used by the Debtor in production of Chrysler's parts. The same day, Chrysler filed a motion requesting an expedited hearing regarding its motion for relief from stay, a memorandum of law in support and many supporting documents. On Monday, February 4, 2008,

-16-

Chrysler filed an adversary complaint seeking an immediate temporary restraining order requiring the Debtor to turn over all of the tooling it used in production of Chrysler's parts immediately to Chrysler. Chrysler also sought an immediate hearing in the adversary proceeding. On February 4, 2008, the Court conducted a hearing to determine whether to grant Chrysler an expedited hearing with respect to its motion for relief from stay in the bankruptcy case and with respect to its motion for preliminary injunctive relief in the adversary proceeding. The Court determined to grant Chrysler an expedited hearing, although not as soon as Chrysler wanted. The Court scheduled a hearing on the motion for relief from stay in the bankruptcy case and the motion for preliminary injunction in the adversary proceeding for February 13, 2008. Although not as accelerated as Chrysler wanted, the hearing was still scheduled to take place only 12 days after the commencement of the Chapter 11 case.

## IV. Positions of the Parties

Chrysler requests that the Court lift the automatic stay of § 362 of the Bankruptcy Code to permit it to enter onto the Debtor's premises and take all of the tooling necessary for production of its component parts. Chrysler has paid over $167,000,000 for tooling used by the Debtor to make parts for Chrysler and asserts that it owns the tooling that it has paid for. Chrysler acknowledges that there is approximately $13,400,000 of unpaid tooling that the Debtor uses in making component parts for Chrysler but says that it will immediately pay the $13,400,000 into an escrow account so that it may also take possession of the unpaid tooling as well as the paid tooling. Chrysler relies upon the tooling acknowledgments contained in the First and Second Accommodation Agreements (J. Exs. 104 and 106) as providing it with ownership of the tooling it has paid for and the right to immediate possession of both the paid and unpaid tooling, in accordance with the plain terms of

-17-

those agreements. According to Chrysler, the Debtor has no rights in the paid tooling and any rights in the unpaid tooling will be extinguished upon payment by Chrysler of the remaining $13,400,000 owing. In the adversary proceeding, Chrysler requests turnover of all of the tooling by entry of an order compelling the Debtor to immediately return the tooling and, until such time as the tooling is returned, an order compelling the Debtor to continue shipping existing inventory and component parts according to the price and terms established by previously submitted Chrysler purchase orders. Without the relief from the automatic stay and without the entry of a preliminary injunction, Chrysler alleges that it will suffer an interruption of supply, immediately idling many of its plants and employees and causing it catastrophic losses. Chrysler also contends that it properly terminated all of its contractual relationships with the Debtor in accordance with the terms of the governing documents. However, Chrysler further states that the Court need not adjudicate the propriety and effectiveness of its termination of the contractual relationships between Chrysler and the Debtor because, in any event, Chrysler is entitled to immediate possession of the Chrysler owned tooling and the unpaid tooling pursuant to the tooling acknowledgments contained in the First and Second Accommodation Agreements.

The Debtor argues that Chrysler failed to properly terminate its contractual relationship with the Debtor. Specifically, the Debtor asserts that Chrysler's letters of January 15 and 16, 2008, and its termination letter of February 1, 2008, are ineffective under the Amended Long Term Productivity Agreement, purchase orders and general terms and conditions. The Debtor further asserts that it is premature in such an early stage of this Chapter 11 case to grant any relief from the automatic stay to Chrysler. Even though the First and Second Accommodation Agreements contain tooling acknowledgments, the Debtor maintains that it still has an interest in both the paid and

unpaid tooling, and that all of this tooling is necessary to an effective reorganization of the Debtor. The Debtor contends it would be inconsistent with the policies of Chapter 11 to permit Chrysler in the infancy of this case to take possession of the tooling. The Debtor alleges that if the Court were to grant such relief to Chrysler, the Debtor would immediately be forced to close many of its plants and would be unable to continue to provide its other Major Customers with their component parts, thereby effectively ending the Debtor's business. The Debtor also argues that even if Chrysler is able to show that it is likely to be successful in ultimately obtaining possession of the tooling in the adversary proceeding, the Court should not grant preliminary injunctive relief in the adversary proceeding because any harm suffered by Chrysler is somehow "self inflicted," and that Chrysler could avoid any such harm by continuing to leave its tools with the Debtor and continuing to purchase product from the Debtor. Further, even if Chrysler does experience harm in the absence of an injunction, the Debtor argues that such harm is not irreparable and, in any event, is greatly outweighed by the harm that the Debtor would suffer if the injunction is granted.

The Revolving Lenders assert that any accounts receivable owing by Chrysler to the Debtor are part of the collateral for their revolving lending facility. Therefore, the Revolving Lenders assert that any relief for Chrysler should be conditioned upon Chrysler paying its accounts receivable purchasing the Chrysler inventory and paying for any unpaid tooling. The First Lien Term Lenders assert that they hold a lien upon both the paid and unpaid tooling used by the Debtor to make Chrysler's parts and that the tooling acknowledgments contained in the First and Second Accommodation Agreements are ineffective to extinguish their interest in the tooling. The Second Lien Term Lenders also assert that they hold a security interest in the paid and unpaid tooling and, while differing in their views regarding the priorities of the various liens in the tooling, agree with

-19-

the First Lien Term Lenders that any tooling acknowledgments contained in the First and Second Accommodation Agreements are ineffective to extinguish their interest. The Revolving Lenders, the First Lien Term Lenders and Second Lien Term Lenders all oppose the relief requested by Chrysler.

Several other creditors, including some of the fabricators of the tooling, also assert an interest in the tooling and oppose some or all of Chrysler's various requests for relief. The Committee also opposes Chrysler's motions and argues that such relief would, if granted, destroy the Debtor's business and effectively end this Chapter 11 case. The other Major Customers concur with Chrysler's view of the legal efficacy of the tooling acknowledgments contained in the First and Second Financial Accommodation Agreements, to which they are also parties, but take no position regarding whether there is some other basis to deny the relief requested by Chrysler.

V. <u>The Motion to Lift Stay Under Section 362</u>

A. <u>Does the automatic stay of § 362 apply to prevent Chrysler from taking immediate possession of the tooling?</u>

Section 362(a) of the Bankruptcy Code operates as a stay applicable to all entities with respect to "(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The first issue then is whether the tooling, both paid and unpaid, is property of or from the Debtor's bankruptcy estate that is subject to the automatic stay.

The evidence shows that Chrysler paid to the Debtor over $167,000,000 for tooling, and that there remains approximately $13,400,000 owing by Chrysler with respect to some of the tooling utilized by the Debtor to make parts for Chrysler. There are therefore two categories of tooling at

-20-

issue: the tooling paid for by Chrysler, which comprises the vast majority of the tooling, and the unpaid tooling. Chrysler asserts that it owns the tooling it has paid for and it is therefore not property of the estate.

The term "tooling" as used in the automobile industry generally refers to certain tangible personal property that it is used to make metal or plastic parts for an automobile. Donald Coates, the Debtor's vice president of manufacturing, planning and strategy, explained that there are generally three types of tooling. Arthur Nelson, the senior director of the operations group at BBK also testified regarding the three types of tooling. Basically, the two witnesses agreed that there are "primary tools," consisting of a mold, stamp or die; "secondary tools" such as a sensor for quality requirements or the end of an arm tool on a robot; and "secondary equipment" consisting of stand alone pieces of equipment. Generally, Chrysler issues purchase orders for the required tooling to its parts supplier, in this case the Debtor, and then pays the supplier for the tooling after the tool has been manufactured, tested and approved. The tool manufacturer is then paid by the supplier. The tooling is used by the supplier at its premises and is stamped with an identification as Chrysler's tool. In this case, Chrysler maintains a list of the tooling (J. Ex. 103) that includes both paid and unpaid tooling. Chrysler relies on the tooling acknowledgments contained in the First and Second Accommodation Agreements to support its assertion that the Debtor does not have an interest in any of the tooling paid for by Chrysler and therefore it is not protected by the automatic stay of § 362. The Court disagrees. Even with respect to the tooling paid for by Chrysler, it is undisputed that the Debtor presently holds a possessory interest in that tooling. That interest alone is sufficient to constitute an interest under § 541 of the Bankruptcy Code and sufficient to invoke the provisions of the automatic stay of § 362(a)(3).

Under § 541(a)(1), property of the estate includes "all or legal or equitable interests of the debtor in property as of the commencement of the case." "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent . . . ." Segal v. Rochelle, 382 U.S. 375, 379 (1966). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." In re Yonikus, 996 F.2d 866, 869 (7th Cir. 1993). Even a bare possessory interest such as a tenancy at sufferance, is "an interest in real property within the scope of the estate in bankruptcy under section 541." Convenient Food Mart No. 144, Inc. v. Convenient Industries of America, Inc. (In re Convenient Food Mart No. 144, Inc.), 968 F.2d 592, 594 (6th Cir. 1992) (citations omitted).

Even assuming that the Debtor has only a possessory interest in the tooling paid for by Chrysler, that is a sufficient interest by itself to cause the application of the automatic stay. If that is so, then it necessarily follows that the Debtor has a sufficient interest in the unpaid tooling to constitute an interest in property of the estate under § 541(a) and therefore to also invoke the automatic stay provisions of § 362(a)(3) with respect to such unpaid tooling. The tooling need not be "owned" by the Debtor in order for the stay to apply. The stay protects *interests in property* whether an ownership interest, possessory interest or some other interest. Thus, without deciding the nature or extent of the Debtor's interest in both the paid and unpaid tooling, and without diminishing any of Chrysler's rights in both the tooling that it has paid for as well as the unpaid tooling under the tooling acknowledgments, it is clear to the Court that the automatic stay applies to both categories of tooling.

B.      Is there cause to lift the stay under § 362(d)(1)?

Section 362(d)(1) of the Bankruptcy Code provides that on request of a party in interest and

after notice and a hearing, the Court shall grant relief from the automatic stay, such as by terminating, annulling, modifying, or conditioning such stay "(1) for cause, including the lack of adequate protection of an interest in property of such party in interest." The Bankruptcy Code does not define "cause" as used in § 362(d)(1). Therefore, under § 362(d)(1), "courts must determine whether discretionary relief is appropriate on a case by case basis." Laguna Associates L.P. v Aetna Casualty & Surety Co. (In re Laguna Associates L.P.), 30 F.3d 734, 737 (6th Cir. 1994). "As used in § 362(d)(1), the term 'cause' is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." In re Indian River Estates, Inc., 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003) (citation omitted). "In determining whether cause exists, the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code." In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995) (citation omitted) (finding that a modification of the stay was "for the benefit of all involved").

In this case Chrysler asserts that the cause to lift the automatic stay consists of the following:

1. Chrysler properly terminated its pre-petition contractual relationship with the Debtor and may now resource its business with other suppliers;

2. Even if it has not properly terminated its contractual relationship with the Debtor, Chrysler is still entitled to immediate possession of the tooling that it has paid for under the tooling acknowledgments in the First and Second Accommodation Agreements;

3. Even if there remains some unpaid tooling, if there is a dispute over payment, Chrysler is still entitled to immediate possession of such unpaid tooling under the

tooling acknowledgments in the First and Second Accommodation Agreements;

4.      The Debtor cannot continue to produce component parts for Chrysler in accordance with the pricing and terms and conditions of Chrysler's existing purchase orders without requesting additional monetary accommodations from Chrysler;

5.      If Chrysler does not obtain possession of the tooling used by the Debtor to produce parts for it, Chrysler will have an interruption in the supply of parts causing it to shut down certain of its plants and idling many of its employees resulting in substantial damages to it; and

6.      The interruption of production and the consequent losses will harm Chrysler's goodwill.

The evidence shows that Chrysler bargained for the tooling acknowledgments in the First and Second Accommodation Agreements.  In exchange for those rights, Chrysler provided the Debtor with substantial financial accommodations consisting of funds that it was not contractually obligated to pay and advanced payment of other funds that it was contractually obligated to pay. The evidence also shows that the Debtor was requesting even more financial accommodations in the draft of the Third Accommodation Agreement and requiring even more from Chrysler going forward.  The evidence also shows that if Chrysler does not receive possession of its tooling, it will be forced to either continue to purchase parts from the Debtor on some basis that may require it to make additional accommodations going forward or, alternatively, close many of its plants and idle many of its employees while it begins the process of resourcing with new suppliers without being able to transfer possession of the tools used by the Debtor in making parts for Chrysler.  Richard Schmidt, the senior manager of material supply operations at Chrysler, testified that if possession

-24-

of the tools is not received at the end of the current interim agreement with the Debtor,[2] it could be as little as five hours before Chrysler would see disruptions in its assembly lines, which would be followed by lay offs and, ultimately, substantial damages to Chrysler. There is evidence establishing that Chrysler will suffer economic harm either by having to contribute additional financial accommodations to the Debtor, or by having to shut down certain of its assembly lines and idle certain of its workers if it does not obtain the tooling.

On the other hand, if the stay is lifted and Chrysler is permitted to take possession of the tooling used to make parts for it, the evidence shows that many of the Debtor's plants will have to be immediately shut down. Mathew Demars, the Debtor's president of interior and exterior business units, testified that of the Debtor's 36 manufacturing facilities, 21 produce parts for Chrysler. Of the 21, two of them are virtually entirely engaged in making parts for Chrysler and another 9 of them have 25% or more of Chrysler revenue as part of their operating structure. The cost to close these plants is $8,000,000 to $9,000,000 per facility according to Demars. Ordinarily, if the Debtor had to shut down a plant, it would do so in coordination with its customers. To protect the Debtor's Major Customers before a plant closure in order minimize impact on their production, Demars explained that the Debtor would build a parts bank and ensure an uninterrupted flow of parts to that customer, then transfer the tooling to a new facility. The time to accomplish that can be three to four weeks because of the need to implement the "PPAP" process to ready the new production line for the making of parts. If Chrysler is permitted to take immediate possession of all of its tooling at this

---

[2] Chrysler and the Debtor stipulated on the record on February 13, 2008, that they had entered into an interim post-petition agreement for the Debtor to produce parts for Chrysler pending the outcome of this hearing and that such interim agreement would cost Chrysler $3,000,000 above the price for its parts during this period to help cover the Debtor's "cash burn" during this period.

time, Demars explained that 11 of the Debtor's plants would immediately turn to negative margin plants and 8 of them would immediately have to close. The testimony was conflicting between Chrysler's witnesses, who believe that the removal of the tooling from the Debtor could be accomplished promptly and without extended disruption to the Debtor's other business operations, and the Debtor's witnesses, who believe that Chrysler's removal of the tooling would cause an immediate, extended and disastrous impact on the Debtor's ability to provide parts for its customers. However, the evidence in the record persuades the Court that regardless of which estimate of timing is closer to reality, it is a fact that removal of Chrysler's tooling will cause a substantial disruption to the Debtor's operations and significantly impair its ability to continue to produce parts for its other Major Customers.

The record demonstrates that Chrysler will suffer economic harm if the Court concludes there is not cause to lift the stay at this time. The record also demonstrates that the Debtor will suffer economic harm if the Court concludes that there is cause to lift the stay. But in the process of balancing the competing policies to determine whether sufficient cause has been shown, there are other facts in the record that are important to the Court. First, it is very early in this Chapter 11 case. The motion to lift stay was filed literally the day after the Debtor filed its Chapter 11 petition. This case is in its infancy. This is not a small case. It is a large case with 36 manufacturing facilities, 7,700 employees and many business entities who are suppliers to the Debtor and depend themselves upon the Debtor's business. The Debtor has approximately $500,000,000 of secured debt. It has projected annual sales of over $1 billion to its other Major Customers, without even considering the Chrysler sales volume. It is an important supplier to GM, Ford and JCI, that has been in business for over 20 years. There are other creditors in this case who claim an interest in the tooling Chrysler

seeks to take. In short, there are many parties who have legitimate and substantial interests in this case that will be greatly affected if not destroyed by a lift of the automatic stay at this point in the case. Chrysler's rights and interests are valid and important, but so are those of the Debtor and the other constituents in this case. Determining cause is not a litmus test or a checklist of factors. It requires consideration of many factors and a balancing of competing interests. After carefully considering the evidence in this record, including the impact upon Chrysler, the Debtor, the Debtor's employees, other Major Customers, and secured and unsecured creditors, the Court concludes that Chrysler has not met its burden of proof to demonstrate "cause" to lift the automatic stay under § 362(d)(1).

To be sure, cause is an elastic concept. "[I]f the relief from stay is requested at the early stages of the bankruptcy case, the burden upon the debtor is less stringent. But, if relief from stay is requested later in the case, the debtor's showing is closely scrutinized." Sumitomo Trust & Banking Co. v. Grand Rapids Hotel L.P. (In re Holly's Inc.), 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992) (citing United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 376 (1988)). The longer the case goes on, the more the analysis may change and the balance of competing interests may compel a different result. But, in a case in such early stages as this one, where the consequences of lifting the stay are shown by the evidence to be so devastating to the Debtor and virtually all other parties in interest, the Court is just not persuaded that the balancing of the various interests in the case supports a finding at this time that there is cause to lift the automatic stay.

C.    Are there grounds to lift the stay under § 362(d)(2)?

In addition to requesting relief from the automatic stay based upon the "cause" standard

under § 362(d)(1), Chrysler requests relief from the stay under § 362(d)(2). That section of the Bankruptcy Code provides that: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning [the] stay . . . with respect to a stay of an act against property . . . , if (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Relief requires a showing of both elements. Chrysler has the burden of proof as to lack of equity. The Debtor has the burden of proof as to all other issues. See § 362(g).

"'Equity,' is the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors." Stephens Industries, Inc. v. McClung, 789 F.2d 386, 392 (6th Cir. 1986) (concluding that "the Bankruptcy Court did not abuse its discretion if refusing to lift the automatic stay" to allow a secured creditor to pursue its remedies in a state court foreclosure action) (citation and internal quotation marks omitted).

Establishing that property is "necessary to an effective reorganization" "requires [ ] not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be a reasonable possibility of a successful reorganization with a reasonable time." United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 375-76 (1988) (citations and internal quotation marks omitted).

The evidence in this case demonstrates that the Debtor does not have any equity in the tooling that Chrysler has paid for. The tooling acknowledgments alone provide sufficient evidence that the Debtor has no equity in the paid tooling. Even without the express provisions of the tooling acknowledgment in the First and Second Accommodation Agreements, the Debtor still has no equity

-28-

in the tooling paid for by Chrysler. Chrysler presented evidence of the amount that it paid for the tooling. Chrysler also presented testimony that, due to the unique nature of the parts produced by the tooling, the tooling would have no value other than scrap to any other entity. The Revolving Lenders, the First Lien Term Lenders, Second Lien Term Lenders and the tool makers all claim a security interest in whatever interest the Debtor may have in any of the tooling. Their claims aggregate over $500,000,000. From this record, the Court concludes that Chrysler has met its burden to show that the Debtor does not have any equity in the Chrysler tooling that is paid for. The Court is also persuaded that Chrysler has met its burden to show that the Debtor does not have any equity in the unpaid tooling as there is approximately $13,400,000 still owing with respect to such unpaid tooling in addition to the various liens of the Debtor's secured creditors which may attach to the Debtor's interest in such unpaid tooling. In sum, the Court is persuaded that Chrysler has met its burden to show that the Debtor does not have equity in any of the tooling, be it paid or unpaid. The tougher issue under § 362(d)(2) is whether the Debtor has met its burden of proof under § 362(g) to show that the tooling is necessary to an effective reorganization.

The record is clear that at the time that Chrysler sent its termination letter on February 1, 2008, there was no agreement between the Debtor and the Major Customers to provide any further financial accommodations. Further, the evidence shows that the Debtor was in breach of financial covenants with its secured lenders at that time and there was no agreement as of that date between the Debtor and its secured lenders for them to forbear from enforcing their rights and remedies against the Debtor. The evidence does not demonstrate that the Debtor had accomplished a restructuring on the date that it received the termination letter from Chrysler. However, the evidence does show that even though the Debtor had no firm agreement with the Major Customers and

-29-

lenders, it was still engaged in good faith and intensive negotiations to try to reach an agreement for a restructuring plan.

Andrew Yearley, the managing director of Lazard Frères & Co. LLC ("Lazard") testified that the Debtor retained Lazard as its investment banker in mid-January, 2008, to assist the Debtor in developing a restructuring plan for its business, potentially seeking new capital and other restructuring. Yearley testified that discussions had taken place between the Debtor and its customers, lenders and potential investors. Yearley could not say that a transaction had been agreed upon but he did testify to a high degree of confidence that a restructuring plan with the Debtor's customers, lenders and perhaps outside investors could have been accomplished over the next several days but for Chrysler's actions on February 1, 2008.

Donald MacKenzie, the Debtor's financial advisor from CMD, testified that at the time of the February 1, 2008 termination letter, the Debtor still had a "top line" of $1.2 billion or $1.3 billion and a proven capability to produce engineered component plastic injection molded and assembled parts with substantial customers, significant contracts, a strong work force and a supportive group of lenders. In MacKenzie's view, this Debtor "has a heart beat" and there are many ingredients present upon which a restructuring transaction could be built.

Permitting Chrysler to take possession of its tooling at this time will likely destroy the possibilities for an effective reorganization. Demars' testimony established that an immediate turn over of possession of the tooling to Chrysler will result in 11 of the Debtor's plants becoming immediately negative margin contributors and will cause 8 plants to shut down and a substantial work force to be laid off. From reviewing the evidence, the Court is convinced that if Chrysler takes immediate possession of the tooling, the Debtor will not be able to continue to provide parts

-30-

uninterrupted to its other Major Customers and therefore any prospect of an effective reorganization will be lost. It is true that the Debtor does not have a reorganization already developed and agreed to. But it is less than 3 weeks into this Chapter 11 case and the Debtor's efforts have largely been consumed with litigating with Chrysler. The Debtor does not have to demonstrate today that it has already accomplished a reorganization but only that it has a prospect for an effective reorganization and that the tools that Chrysler seeks to take at this time are necessary to an effective reorganization. It is possible that a reorganization may ultimately not involve the continued production of parts for Chrysler. But it is too early to say. At this stage, the Court is convinced that the Debtor has met its burden to show that the tooling is necessary to an effective reorganization. Compare Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.), 101 F.3d 882, 884, 886 (2nd Cir. 1996) (in affirming a lift of the stay under § 362(d)(2), finding the debtor had no "credible reorganization plan in prospect," and agreeing with the bankruptcy court's characterization that the debtor's proposed plan "was based on 'fanciful' calculations that were 'conclusory and unsubstantiated expressions of optimism'"). Without the tooling the Debtor will immediately close plants, interrupt the production of parts for its remaining customers and begin idling employees. With the tooling, while the Debtor cannot force Chrysler to do business with it if it is not contractually obligated, the Debtor has the prospect of an effective reorganization. That is all the law requires at this early stage in the case. After considering all of the evidence, the Court finds that, both the paid and unpaid tooling are necessary to an effective reorganization. That analysis may change in the future, but today the evidence establishes that they are necessary. Therefore, Chrysler is not entitled to relief under § 362(d)(2) of the Bankruptcy Code.

## VI.  Motion for Injunctive Relief

Chrysler's first amended complaint in the adversary proceeding contains five counts.  Count I requests turnover of the tooling used by the Debtor to make Chrysler parts.  Count II requests an order compelling immediate turnover of the tooling together with an interim order requiring the Debtor to ship existing inventory and produce parts according to the price and terms established by Chrysler's purchase orders with the Debtor.  Count III alleges breach of contract and again requests an order compelling the Debtor to return the tooling.  Count IV requests specific performance and an order compelling the Debtor to return the tooling.  Count V also requests specific performance and an order compelling the Debtor to ship existing inventory, produce new parts and honor the terms of Chrysler's purchase orders.

In deciding whether to grant injunctive relief, the bankruptcy court must consider four factors:  "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest."  Tucker v. City of Fairfield, Ohio, 398 F.3d 457, 461 (6th Cir. 2005) (internal quotation marks and citation omitted).  These factors are to be balanced, and are not prerequisites that must be satisfied in every case.  United States v. Edward Rose & Sons, 384 F.3d 258, 261 (6th Cir. 2004) (citation omitted).  The court "is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue."  Six Clinics Holding Corp., II v. Cafcomp Systems, Inc., 119 F.3d 393, 399 (6th Cir. 1997) (citation omitted).

To satisfy the first factor, Chrysler "must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits."  United of Omaha Life Insurance Co.

v. Solomon, 960 F.2d 31, 35 (6th Cir. 1992) (citation omitted). Absolute certainty of Chrysler's ultimate success is not required for the issuance of an injunction, provided Chrysler makes out a prima facie case for final relief. Id.

All of the relief requested by Chrysler's first amended complaint is based upon the contractual documents that were entered into with the Debtor pre-petition. To some extent, the relief is based upon Chrysler's purchase orders (Chrysler's Ex. 1), Chrysler's general terms and conditions (J. Ex. 100), the long term productivity agreement (J. Ex. 101) and the amended long term productivity agreement (J. Ex. 102). The relief sought is also based upon the tooling acknowledgments contained in the First Accommodation Agreement (J. Ex. 104) and the Second Accommodation Agreement (J. Ex. 106). Chrysler asserts that its letters of January 15, 2008 (J. Ex. 108) and January 16, 2008 (J. Ex. 109) demonstrate that the Debtor was in breach of the purchase orders, general terms and conditions and the amended long term productivity agreement. Although Chrysler asserts that it terminated all of those contractual provisions by its February 1, 2008 letter (J. Ex. 107), Chrysler requests that the Debtor be ordered to perform in accordance with the terms of those documents. Chrysler also asks for relief based upon the First and Second Accommodation Agreements.

Chrysler says that it has met the first element for injunctive relief by establishing the existence of the contracts and its entitlement to enforce them against the Debtor. Chrysler also argues that irrespective of the rights it may have under its purchase orders, general terms and conditions and long term productivity supply agreements, it has a clear, unambiguous contractual right to possession of the tooling under the tooling acknowledgments set forth in the First and Second Accommodation Agreements (J. Exs. 104 and 106). Therefore, despite the Debtor's

-33-

arguments and evidence regarding whether the purchase orders, general terms and conditions and long term productivity agreements have been terminated or not, Chrysler argues that it meets the first element for injunctive relief regarding turnover of the tooling because it has demonstrated a likelihood of success on the merits of its ultimate entitlement to possession of the tooling under the tooling acknowledgments. Whatever findings the Court may make regarding the status of the other contracts between the Debtor and Chrysler, Chrysler argues that this is a simple case to determine Chrysler's rights to possession under the contractual provisions of the accommodation agreements.

There are three documents that include a provision for governing law. All three provide that Michigan law controls the construction of the agreement: the general terms and conditions (J. Ex. 100 ¶26); the First Accommodation Agreement (J. Ex. 104 ¶19.0); and the Second Accommodation Agreement (J. Ex. 106 ¶15.0). Accordingly, the Court looks to Michigan law in construing these agreements.

Under Michigan law, contracts are not open to judicial interpretation and must be enforced as written, "absent ambiguity or internal inconsistency." Universal Underwriters Insurance Co. v. Kneeland, 628 N.W.2d 491, 494 (Mich. 2001); Rory v. Continental Insurance Co., 703 N.W.2d 23, 30 (Mich. 2005). Whether a contract term is clear or ambiguous is a question of law for the court. Campbell v. Potash Corp. of Saskatchewan, Inc., 238 F.3d 792, 797 (6th Cir. 2001); GenCorp, Inc. v. American Int'l Underwriters, 178 F.3d 804, 817 (6th Cir. 1999); Henderson v. State Farm Fire and Casualty Co., 596 N.W.2d 190, 193 (Mich. 1999) (citation omitted). In making this determination, the Court must look at the contract as a whole "giving harmonious effect, if possible, to each word and phrase." Wilkie v. Auto-Owners Insurance Co., 664 N.W.2d 776, 781 n.11 (Mich. 2003) (citation omitted). However, if the language is ambiguous, its interpretation is a question of

fact. See UAW-GM Human Resource Center v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. Ct. App. 1998) (quoting Port Huron Education Ass'n v. Port Huron Area School District, 550 N.W.2d 228, 237 (Mich. 1996)).

Contract terms are ambiguous if they "are reasonably and fairly susceptible to multiple understandings and meanings." Equitable Life Assurance Society of the United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998). Legal ambiguity requires "two or more reasonable interpretations." GenCorp, Inc. v. American Int'l Underwriters, 178 F.3d at 819. "If a contract contains ambiguities, it generally becomes the task of the fact-finder to use extrinsic evidence to determine the intent of the parties." Royal Insurance Co. v. Orient Overseas Container Line Ltd., ___ F.3d ___, 2008 WL 238452 (6th Cir. 2008). In determining the intent of the parties, the Court must "examine the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument." Wilkie v. Auto-Owners Insurance Co., 664 N.W.2d at 780. (citation omitted).

On the other hand, under Michigan law if the provisions of a contract are not ambiguous, the contract "'must be enforced as written.'" See, e.g., United Rentals (North America) Inc. v. Keizer, 355 F.3d 399, 407 (6th Cir. 2004) (quoting Britton v. John Hancock Mutual Life Ins. Co., 186 N.W.2d 781, 782 (Mich. Ct. App. 1971)); see also Farm Bureau Mutual Insurance Co. of Michigan v. Nikkel, 596 N.W.2d 915, 919 (Mich. 1999) (citation omitted). The Court does not have the authority "to make a different contract for the parties . . . when the words used by them are clear and unambiguous and have a definite meaning." Zurich Insurance Co. v. CCR and Co., 576 N.W.2d 392, 395 (Mich. Ct. App. 1997) (quoting McIntosh v. Groomes, 198 N.W. 954, 955 (Mich. 1924)); see also UAW-GM Human Resource Center, 579 N.W.2d at 414 (citations omitted). This is further

-35-

supported by what the Michigan Supreme Court has described as "the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." Wilkie v. Auto-Owners Insurance Co., 664 N.W.2d at 782.

There is evidence in the record that the Debtor breached its pre-petition contractual relationship with Chrysler. The evidence is somewhat conflicting as to whether Chrysler had the right to terminate its relationship with the Debtor on account of such breach and, if so, whether the February 1, 2008 letter (J. Ex. 107) accomplished the termination. But the evidence is not conflicting regarding Chrysler's contractual right to demand possession both of the paid and unpaid tooling. The tooling acknowledgments contained in Section 4.0 of the First Accommodation Agreement (J. Ex. 104) and Section 4.5 of the Second Accommodation Agreement are clear and unambiguous in conferring upon Chrysler the right to take immediate possession of the tooling that it paid for and the right to take immediate possession of any unpaid tooling with respect to which there is a dispute over payment. The application of basic principles of contract construction under Michigan law compels the conclusion that the tooling acknowledgments in so far as they grant a right to immediate possession in favor of Chrysler, are entirely enforceable according to their terms. There is nothing ambiguous about them. Doran testified that these rights were valuable to Chrysler and were the very reason why Chrysler agreed to the financial accommodations requested by the Debtor in February, 2007, and again in January, 2008. The evidence and legal arguments presented by the Debtor do not persuade the Court that there is any reason not to enforce the possessory rights conferred by the tooling acknowledgments.

The Revolving Lenders, First Lien Term Lenders and Second Lien Term Lenders as well as

some of the fabricators of the tooling argue that they too may have rights in the tooling. But there is nothing about their arguments that would in any way diminish the right of Chrysler to fully expect that the possessory rights conferred upon it in the tooling acknowledgments be enforced. Chrysler, the Debtor and the Major Customers are all sophisticated, knowledgeable business persons who fully comprehend the meaning of the possessory rights conferred upon Chrysler by the tooling acknowledgments. The Court concludes that Chrysler has met its burden to demonstrate a strong or substantial likelihood or probability that it will be successful on the merits with respect to its right to demand possession of the tooling that it has paid for and any unpaid tooling with respect to which there is a dispute.

However, the Court is not persuaded that Chrysler has met its burden to show that it is likely to succeed on the merits of a claim for specific performance pursuant to which the Court should affirmatively order the Debtor to continue to make parts for Chrysler in accordance with Chrysler's pre-petition purchase orders, general terms and conditions and long-term productivity agreements. Chrysler asserts that it terminated all of such agreements pre-petition on February 1, 2008, yet apparently now requests that the Court compel the Debtor to continue to perform under such agreements. Chrysler does not reconcile these positions. Even without this inconsistency, the record was not sufficiently developed to enable the Court to find that Chrysler has the right to command specific performance. Although the Court finds that Chrysler has met its burden to show a likelihood of success on the ultimate merits of its claim to possession of the tooling under the First and Second Accommodation Agreements, the Court finds that Chrysler has not met its burden to show a likelihood of success with respect to the ultimate merits of its claim that the Debtor is contractually required to continue to produce parts in accordance with its pre-petition agreements

-37-

with the Debtor.

In addition to success on the merits, the party seeking injunctive relief must show "'irreparable injury and the inadequacy of legal remedies.'" United States v. Miami University, 294 F.3d 797, 816 (6th Cir. 2002) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Courts have broad discretion to evaluate the irreparability of the harm. As the Sixth Circuit has noted "a plaintiff's harm is not irreparable if it is fully compensable by money damages." Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir.1992).

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [injunctive relief], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Sampson v. Murray, 415 U.S. 61, 90 (1974) (citation omitted).

The evidence in this case demonstrates that Chrysler will suffer economic harm if its request for injunctive relief is not granted. Chrysler will be placed in the position of having to choose among several unattractive alternatives. One alternative is to begin idling certain of its plants and a substantial number of its work force while its tooling remains with the Debtor thereby preventing Chrysler from transferring the tooling to another supplier to make the parts. A second alternative is to contract with manufacturers of tooling to make replacement tooling for alternative suppliers to use to make parts for Chrysler. A third alternative is to go back to the bargaining table with the Debtor and other stakeholders in this case and attempt to negotiate an interim arrangement with the Debtor for a continued uninterrupted supply of parts to Chrysler while the Debtor works toward the development of a Chapter 11 plan of reorganization in the early stages of this case. None of these alternatives are attractive to Chrysler. All of them will result in Chrysler suffering some economic harm. The degree and amount of the harm differs for Chrysler depending upon which alternative

-38-

it chooses. Even Chrysler concedes that there will be an interruption in its supply of parts if the Court were to grant its injunctive relief and require the turnover of the tooling by the Debtor. While BBK's estimate of the time it would take to retrieve the tooling from the Debtor's plants is far shorter than the Debtor's estimate, nonetheless, even Chrysler concedes there would be an interruption in its parts supply causing it substantial harm. The record does demonstrate that Chrysler may suffer harm if the Court does not grant its injunction and direct the Debtor to immediately turn over possession of the tooling. But the harm is measurable in monetary damages, there is a remedy at law for damages, and the amount of the damages can be mitigated depending upon which alternative course of action Chrysler pursues. While it is true that Chrysler may suffer damages absent injunctive relief, those damages are compensable by money and do not in the Court's view constitute irreparable injury.

Even assuming Chrysler has established irreparable injury, this injury must be balanced against any harm that will be suffered by others as a result of granting injunctive relief. Martin-Marietta Corp. v. Bendex Corp., 690 F.2d 558, 568 (6th Cir. 1982). In determining whether Chrysler's motion to lift stay for cause should be granted under § 362(d)(1) of the Bankruptcy Code, the Court conducted a balancing of the harm that would be suffered by Chrysler against the harm that would be suffered by the Debtor and the other constituents in this Chapter 11 case. For the same reasons that the Court explained in that section of the opinion, the Court concludes that Chrysler's legitimate and substantial interests which may be harmed in the absence of injunctive relief are, at this moment in time, outweighed by the harm that would be suffered by the Debtor, its creditors and this estate by the granting of such relief. The Court concludes that this factor weighs in favor of the denying the request for injunctive relief.

The final factor looks at whether there are policy considerations that bear on whether the injunctive relief should be granted. In this respect, the Sixth Circuit has held

> where a temporary injunction is sought which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the complainant.

Huard-Steinheiser, Inc. v. Henry, 280 F.2d 79, 84 (6th Cir. 1960) (citing Virginian Ry. Co. v. United States, 272 U.S. 658, 672 (1926); Yakus v. United States, 321 U.S. 414, 440(1944)).

There are public interests at stake in this case. Public policy unquestionably supports respecting contractual provisions that are bargained for and agreed upon in good faith and at arms length. That public policy militates in favor of Chrysler. However, that public policy must also be balanced against the policy considerations of Chapter 11. Chapter 11 provides a breathing spell and an opportunity to reorganize. "One of the primary purposes of Chapter 11 of the bankruptcy laws is the provision of time for debtors to implement plans of payment to creditors without the burden of impending litigation." In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (citation omitted). The fact that Chrysler has an enforceable contract with the Debtor does not mean that the Debtor is not entitled to exercise its right to file Chapter 11 and seek the protections of that statute. "The automatic stay provision of the Bankruptcy Code, § 362(a), has been described as one of the fundamental debtor protections provided by the bankruptcy laws." Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection, 474 U.S. 494, 503 (1986) (internal quotation marks and citation omitted). Chapter 11 cases have the effect of conferring rights upon a debtor that it would not have absent Chapter 11 relief, one of them being to delay the enforcement of the rights of non-debtor parties against the debtor to permit the debtor to reorganize.

-40-

Just because a non-debtor party has a contract with a debtor does not mean that the Court should disregard the purposes and policies behind Chapter 11. On balance, the Court considers there to be important policies in support of both Chrysler and the Debtor. Therefore, this factor does not weigh strongly in favor of either party.

For these reasons, the Court holds that Chrysler is not entitled to injunctive relief.

## VII. Other Issues

During the course of the hearing, Chrysler, the Debtor and various other parties raised a number of legal and factual issues. A great deal of time and energy was spent addressing whether the January 15 and 16, 2008 letters (J. Exs. 100 and 109) effectively terminated the pre-petition contracts between Chrysler and the Debtor. Evidence was also adduced and arguments were made regarding the efficacy of the notice given with respect to the February 1, 2008 letter (Chrysler's Ex. 10). The Debtor's secured creditors took various positions regarding their interests in the Chrysler tooling. Finally, a number of parties weighed in on the legal effect of the tooling acknowledgments contained in the First and Second Accommodation Agreements. Although many of these are important issues that may ultimately have to be adjudicated, the Court does not need to reach them to decide the motions before it right now.

The motion to lift stay is a contested matter that determines only whether the stay applies and whether there are grounds to lift it. It would be improper in this procedural context for the Court to adjudicate the nature, validity and extent of the various parties' interests in the tooling. Indeed, Bankruptcy Rule 7001(2) requires an adversary proceeding to determine the nature, extent and validity of an interest in property. The competing interests of Chrysler, the Debtor and the lenders in the Chrysler tooling will appropriately be adjudicated in Chrysler's adversary proceeding.

-41-

The existence of a continuing contractual relationship between Chrysler and the Debtor will also have to be adjudicated in another proceeding. That proceeding may be the adversary proceeding brought by Chrysler or a separate proceeding under § 365 of the Bankruptcy Code. But the determination of all of Chrysler's and the Debtor's rights and liabilities under their pre-petition contracts cannot be made in this accelerated hearing to determine whether the automatic stay of § 362 should be lifted or preliminary injunctive relief granted to Chrysler in the adversary proceeding.

It is also worth pointing out that the hearing on the motion for preliminary injunction is not a trial of that adversary proceeding. Bankruptcy Rule 7065 incorporates Fed. R. Civ. P. 65. Rule 65(a)(2) specifically authorizes the Court to consolidate the hearing on the preliminary injunction with the trial of the merits. No party has requested that and the Court has not ordered that. This is a preliminary hearing only. The ultimate issues regarding Chrysler's actions to terminate its contracts with the Debtor pre-petition, the efficacy of those actions and the interests of the various parties in the Chrysler tooling will have to wait until another day. The hearing conducted by the Court is preliminary in the sense that it adjudicates only whether there is cause to lift the stay at this early point in the bankruptcy and whether there is a basis to impose injunctive relief. The Court has concluded in both instances that there is not.

## VIII. Conclusion

During the course of this hearing, some parties have ramped up the rhetoric calling Chrysler's conduct "over reaching," and "precipitous," and that its damages, if any, are "self inflicted." The Court does not share those views. Chrysler has legitimate and substantial interests at stake in seeking to enforce the rights that it bargained for in the tooling acknowledgments

-42-

contained in the First and Second Accommodation Agreements.  Chrysler correctly points out that it had no contractual obligation to provide any financial accommodations to the Debtor once the Second Accommodation Agreement expired on January 31, 2008.  The Court disregards entirely and considers inappropriate the pejorative labels for Chrysler and Chrysler's conduct.  Chrysler took the actions that it believed were in its best interest and consistent with its contractual provisions when it sent the February 1, 2008 letter and filed suit in Wayne County Circuit Court.  Had the Debtor not filed Chapter 11, Chrysler's exercise of those rights might now be concluded.  But the larger point here is that the Debtor did file a Chapter 11 case and exercised a legitimate right that it has under the law in doing so.  The Court appreciates the fact that Chrysler has legitimate and substantial interests at stake in this Chapter 11.  So too do the Debtor, the other customers and the lenders. While it is hard to understand how the Debtor could ever forge a long term relationship with its customers by litigating with them, the Court is persuaded that the filing of Chapter 11 gives the Debtor an opportunity, a temporary window, to negotiate with its customers, lenders and other constituents.  The law affords that breathing space to the Debtor when it filed its Chapter 11 petition for relief.  But it is not unlimited, and the Debtor should use it wisely.  For all of these reasons, the Court has determined to deny the relief requested.


**For publication.**



Signed on February 19, 2008

                                                   /s/ Phillip J. Shefferly
                                                  Phillip J. Shefferly
                                                  United States Bankruptcy Judge