UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:

Plastech Engineered Products, Inc., et al.[1]        Case No. 08-42417
                                         Chapter 11
             Debtors.                  Hon. Phillip J. Shefferly

                                         Jointly Administered

_____/

## OPINION SUSTAINING PRELIMINARY OBJECTION TO
## ALLOWANCE OF SECURED CLAIM OF WACHOVIA CORPORATION

### I. Introduction

This opinion addresses an objection to the allowance of a secured claim in this Chapter 11

case. On June 26, 2008, Wachovia Corporation ("Wachovia") filed claim #176 as a secured claim

in the amount of $22,794,000. The proof of claim states that Wachovia's claim is secured by a first

lien on the Debtor's assets. On September 10, 2008, the Steering Committee of First Lien Term

Loan Lenders ("Steering Committee") filed a "preliminary" objection to Wachovia's proof of claim.

The Steering Committee, for now, does not object to the amount set forth in Wachovia's proof of

claim. Instead, the Steering Committee asserts that Wachovia's claim should be allowed as a

secured claim only in the amount of $1,000,000 and that the balance of Wachovia's claim should

be disallowed as a secured claim and allowed only as an unsecured claim. The Steering Committee

argues that there are no genuine issues of material fact and that its preliminary objection must be

---

[1] The Debtors are the following entities: Plastech Engineered Products, Inc., LDM Technologies, Inc., Plastech Frenchtown, Inc., Plastech Decorating Systems, Inc., Plastech Exterior Systems, Inc., Plastech Romulus, Inc., MBS Polymet, Inc., LDM Holding Canada, Inc. and LDM Holding Mexico, Inc.

sustained as a matter of law.  Wachovia argues that the Court must deny the Steering Committee's preliminary objection and allow its full secured claim as a matter of law but, at a minimum, asserts that there are genuine issues of material fact that preclude the Court from sustaining the Steering Committee's preliminary objection without conducting further proceedings.  The Court heard the Steering Committee's preliminary objection on November 12, 2008.  For the reasons set forth in this opinion, the Court has determined to sustain the Steering Committee's preliminary objection, and disallow the $21,794,000 claim of Wachovia as a secured claim under § 502(b)(1) of the Bankruptcy Code because the claim is unenforceable as a secured claim against the Debtor and property of the Debtor.  The Court will allow the balance of the claim of Wachovia as a secured claim in the amount of $1,000,000.

## II.  Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and § 157(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## III.  Facts

The following facts are not in dispute.

On February 1, 2008, Plastech Engineered Products, Inc. and a number of related entities filed for relief under Chapter 11 of the Bankruptcy Code.  (Plastech and its related entities are collectively referred to as the "Debtor.")  The Debtor was engaged in business as a tier one automotive supplier and designer and maker of blow-molded and injected-molded plastic parts. Approximately one year before its Chapter 11 petition, in February, 2007, the Debtor entered into a refinancing of its secured debt, creating a revolving credit facility, a first lien term loan and a second lien term loan.  The first lien term loan provided the Debtor with up to $265,000,000 of

-2-

secured term debt. On February 12, 2007, the Debtor entered into a First Lien Term Loan Credit and Guaranty Agreement ("Credit Agreement") as borrower, with Goldman Sachs Credit Partners L.P. ("Goldman") as lead arranger, syndication agent, administrative agent, and collateral agent for various lenders ("First Lien Lenders"). On the same date, the Debtor granted the First Lien Lenders a first lien upon the Debtor's fixed assets pursuant to a Pledge and Security Agreement ("Security Agreement"). Wachovia was not one of the First Lien Lenders nor was it otherwise a party to the Credit Agreement or the Security Agreement when they were signed.

Section 5.12 of the Credit Agreement contains a covenant requiring the Debtor to hedge the risk of market interest rate fluctuations with respect to the term debt evidenced by the Credit Agreement. The covenant provides as follows:

> **5.12 Interest Rate Protection.** No later than sixty (60) days following the Closing Date and at all times thereafter until at least the third anniversary of the Closing Date, Borrower shall obtain and cause to be maintained protection against fluctuations in interest rates pursuant to one or more Interest Rate Agreements in form and substance reasonably satisfactory to Administrative Agent, in order to ensure that no less than $300,000,000 of the total Indebtedness of Borrower and its Subsidiaries then outstanding is either (i) subject to such Interest Rate Agreements or (ii) Indebtedness that bears interest at a fixed rate.

To satisfy the requirement of section 5.12 of the Credit Agreement, the Debtor entered into an ISDA[2] Master Agreement with Wachovia on March 19, 2007 ("Wachovia Swap Agreement"). The First Lien Lenders are not parties to the Wachovia Swap Agreement. The only parties to the Wachovia Swap Agreement are Wachovia and the Debtor. Described by the parties as a "plain vanilla" interest rate swap, the Wachovia Swap Agreement allowed the Debtor to hedge the risk of market interest rate fluctuations by agreeing to exchange cash flows with Wachovia based upon one

---

[2] ISDA stands for International Swap Dealers Association.

party paying a fixed rate of interest and the other party paying a floating rate of interest, and based upon an agreed "notional" amount of principal which was required by the Credit Agreement to be fixed at $300,000,000. On March 22, 2007, Wachovia and the Debtor signed a Swap Transaction Confirmation that states that it is intended to supplement the Wachovia Swap Agreement.

Attached to the Wachovia Swap Agreement is a Schedule that refers to Wachovia as "Party A" and the Debtor as "Party B." Part 1.(h) of the Schedule defines the term "Credit Agreement" by specific reference to the Credit Agreement:

> "**Credit Agreement**" means the First Lien Term Loan Credit and Guaranty Agreement to be entered into in March, 2007 among Party B, as Borrower, Certain Subsidiaries of Party B, as Guarantors, Goldman Sachs Credit Partners L.P., as Lead Arranger, Syndication Agent and Administrative Agent and Collateral Agent, and the other lenders party thereto, as the same exists when executed and without regard to (i) any termination or cancellation thereof or Party A (or any of its Affiliates) ceasing to be a party thereto (whether as a result of repayment thereof or otherwise), or (ii) unless consented to in writing by Party A (or any of its Affiliates), any amendment, modification, addition, waiver or consent thereto or thereof.

Part 1.(h) of the Schedule to the Wachovia Swap Agreement describes "Additional Termination Events" under the Wachovia Swap Agreement. One such "Additional Termination Event," under Part 1.(h)(i), occurs if the Debtor's obligations to Wachovia

> fail at any time to be secured by the collateral which secures the Credit Agreement from time to time ("Collateral") on the same terms in all relevant respects and on a pari passu and pro rata basis with the lenders under the Credit Agreement (such lenders being the most senior class if there is more than one class) (the "Secured Parties" and individually a "Secured Party") . . . .

Further, Part 1.(h)(ii) states that it is also an "Additional Termination Event" under the Wachovia Swap Agreement if Wachovia "is not a Secured Party."

Although Wachovia is not a party to the Credit Agreement or the Security Agreement, and the First Lien Lenders are not parties to the Wachovia Swap Agreement or the Schedule attached

to it, the Schedule to the Wachovia Swap Agreement plainly indicates that Wachovia and the Debtor intended by execution of the Wachovia Swap Agreement to make the obligations of the Debtor under the Wachovia Swap Agreement secured obligations on a pari passu basis with the First Lien Lenders under the Credit Agreement and Security Agreement.[3]

Part 5.(h) of the Schedule to the Wachovia Swap Agreement provides further evidence of Wachovia's and the Debtor's desire to secure the obligations of the Debtor to Wachovia under the Wachovia Swap Agreement by the Debtor's grant of the lien to the First Lien Lenders under the Credit Agreement and Security Agreement. Part 5.(h)(i) requires the Debtor to provide Wachovia "at all times hereunder with the same covenant protection as [the Debtor] provides its lenders or creditors under the Credit Agreement." Part 5.(h)(ii) further reinforces this statement of intention between Wachovia and the Debtor by providing that "if lenders or creditors other than [Wachovia]

---

[3] Apparently, Wachovia harbored some concern over whether the Debtor's obligations to it under the Wachovia Swap Agreement would in fact be covered by the lien granted to the First Lien Lenders under the Credit Agreement and the Security Agreement. In support of its brief in opposition to the Steering Committee's objection, Wachovia filed a declaration signed by Vincent P. Hindman, a Director in the Global Rates Group of Wachovia. The declaration identifies and quotes from two separate emails exchanged between Wachovia and the Debtor in the days immediately preceding execution of the Wachovia Swap Agreement. On March 12, 2007, Hindman emailed Scott Kehoe, the Debtor's Executive Director of Finance, to express this concern:

> Scott, we can do the full 300mm, just need to clarify the security question. From our review of the credit docs, it did appear that the exposure on the hedge would be secured pari passu with the first lien lenders, but our underwriter felt the language was not clear cut. If you or your counsel could just clarify that this is indeed the intent of the doc, then we are good to go.

On March 13, 2007, Kehoe replied to Hindman: "Pari-passu with the first lien term loan lenders is our understanding of the intent of the document." The record does not show any communications between Wachovia and the First Lien Lenders regarding this concern nor does it show any additional communications between Wachovia and the Debtor regarding this concern.

are parties to the Credit Agreement, then references therein to the lenders or creditors shall be deemed references to [Wachovia] . . . ." Wachovia concludes that it is obvious from a review of the provisions in the Schedule to the Wachovia Swap Agreement, that Wachovia and the Debtor intended that the obligations of the Debtor to Wachovia under the Wachovia Swap Agreement would be secured by the Debtor's grant of the first lien to the First Lien Lenders under the Credit Agreement and Security Agreement.

By January, 2008, the Debtor was experiencing substantial financial difficulties. On January 17, 2008, Wachovia wrote to the Debtor to notify the Debtor that an "event of default" had occurred under the Wachovia Swap Agreement. The letter further stated that Wachovia was designating an "early termination date" of January 22, 2008. On January 22, 2008, Wachovia issued a Confirmation of Amendment of Transaction to the Debtor confirming that as of January 22, 2008, Wachovia and the Debtor are each "released and discharged" from their obligations under the Wachovia Swap Agreement and "in consideration of such releases" the Debtor "has agreed to pay to Wachovia" a fixed amount of $21,745,000 payable in quarterly installments beginning immediately and continuing through April, 2012. Paragraph 6 of the January 22, 2008 Confirmation of Amendment of Transaction stated that the Debtor "hereby acknowledges that its obligations under this Transaction shall continue to be a swap agreement obligation secured by the Collateral (as defined in the Schedule to the Master Agreement)." Nine days after the January 22, 2008 Confirmation of Amendment of Transaction, the Debtor filed this Chapter 11 case.

On February 11, 2008, after the Debtor filed its bankruptcy case, Wachovia sent the Debtor a Notice of Amount Due Following Early Termination, informing the Debtor that Wachovia had designated February 7, 2008 as an "early termination date" and that the amount of $21,794,000 was

now due and payable by the Debtor to Wachovia. This Notice did not reference the Credit Agreement or Security Agreement but did reserve for Wachovia "all of its rights and remedies" under the Wachovia Swap Agreement and applicable law.

After filing the bankruptcy case, the Debtor continued its business operations but ultimately entered into negotiations to sell its business in one or more units. The Debtor marketed for sale as business enterprises its interior business, exterior business, stamping and carpeting operations. The Debtor was successful in finding purchasers for these business units. On June 19, 2008, upon the Debtor's motion, the Court entered orders approving § 363 sales of substantially all of the Debtor's business assets. The sale orders provided that the Debtor was authorized and directed to sell its assets under § 363(f) of the Bankruptcy Code free and clear of all liens, claims or encumbrances with all such liens, claims and encumbrances attaching only to the proceeds of sale with the same validity, extent and priority as immediately prior to the sale transactions, subject to any rights, claims and defenses of the Debtor and other parties in interest. The First Lien Lenders credit bid the sum of $184,067,000 of indebtedness under the Credit Agreement at the sale hearing on June 18, 2008. The Court permitted the credit bid under § 363(k) of the Bankruptcy Code because the Court also determined by separate order upon the Debtor's motion to allow a secured claim of the First Lien Lenders under the Credit Agreement and Security Agreement in the sum of $265,000,000. The sales of the Debtor's business assets were consummated on July 1, 2008. Since that time, the Debtor has proceeded to work toward the development of a plan and disclosure statement and otherwise wind up this Chapter 11 case.

Wachovia did not participate in any capacity at the sale hearing, but did file its proof of secured claim on June 26, 2008. The following documents are attached to Wachovia's proof of

claim:

1. Statement of the Basis for Claim Supplementing Proof of Claim, dated June 26, 2008, signed by Colleen McCullum, Managing Director, Wachovia ("Wachovia Statement").

2. Exhibit A to the Wachovia Statement consists of excerpts of the Credit Agreement.

3. Exhibit B to the Wachovia Statement is a copy of an Assignment and Assumption Agreement dated April 25, 2008 between CDL Loan Funding LLC and Goldman.

4. Exhibit C to the Wachovia Statement is a copy of an Assumption and Assignment Agreement dated April 25, 2008 between Goldman and Wachovia.

5. Exhibit D to the Wachovia Statement is a copy of the Swap Transaction Confirmation of March 22, 2007.

6. Exhibit E to the Wachovia Statement consists of a January 22, 2008 Confirmation of Amendment of Transaction, a February 5, 2008 Notice of Early Termination for Event of Default, and a February 11, 2008 Notice of Amount Due Following Early Termination, each sent by Wachovia to the Debtor.

7. Exhibit F to the Wachovia Statement consists of excerpts of the Security Agreement.

Paragraph 1 of the Wachovia Statement recites that the Debtor is indebted to Wachovia in the sum of $1,000,000 "by virtue of an Assignment to Wachovia of $1 Million of First Lien Term Loan debt owed under the Credit Agreement." The Wachovia Statement goes on to also explain that on April 25, 2008, after the Debtor filed its Chapter 11 petition, Wachovia purchased and took an assignment of a $1,000,000 interest in the indebtedness owing under the Credit Agreement to the First Lien Lenders. Paragraph 2 of the Wachovia Statement recites that "[t]he Debtor is also indebted to Wachovia in the sum of $21,794,000," as the early termination fee due to Wachovia when the Wachovia Swap Agreement was terminated as of February 7, 2008. The Wachovia

-8-

Statement explains that the early termination fee due to it is an "Obligation" under the Credit Agreement and is therefore a "First Lien Term Loan Obligation" under the Security Agreement. The Wachovia Statement concludes by asserting that Wachovia is one of the "Secured Parties" under the Security Agreement and that the first lien granted by the Debtor in its assets to the First Lien Lenders pursuant to the Security Agreement therefore also serves as security for payment by the Debtor of the early termination fee of $21,794,000.

In its objection, the Steering Committee concedes that Wachovia is entitled to a $1,000,000 secured claim because of the assignment of debt under the Credit Agreement purchased by Wachovia on April 25, 2008. However, the Steering Committee contends that Wachovia's claim for $21,794,000 for the early termination fee is not an "Obligation" under the Credit Agreement and is therefore not secured by the first lien granted by the Debtor to the First Lien Lenders under the Security Agreement. Although the Steering Committee does not explicitly state that it agrees with the *amount* of the early termination fee, the thrust of its objection is that the early termination fee should only be allowed as an *unsecured* claim and not as a *secured* claim. The Steering Committee requests that the Court determine as a matter of law that its objection to the allowance of Wachovia's claim as a secured claim be sustained.

Wachovia responds to the Steering Committee's objection by stating that even though it was not itself a party to the Credit Agreement and the Security Agreement, the obligations owing by the Debtor to Wachovia under the Wachovia Swap Agreement are secured by the lien granted by the Debtor to the First Lien Lenders pursuant to the Security Agreement for two basic reasons. First, Wachovia argues that the Wachovia Swap Agreement is a "Hedge Agreement" as that term is defined in the Credit Agreement. Because the Wachovia Swap Agreement is a "Hedge Agreement,"

then any obligations of the Debtor to Wachovia under the Wachovia Swap Agreement, including the early termination fee, are within the definition of "Obligations" under the Credit Agreement and are therefore within the scope of the obligations secured by the Security Agreement. As a result, Wachovia says that it is one of the "Secured Parties" as that term is defined in the Security Agreement. For further support, Wachovia points out that even though Wachovia was not itself a party to the Credit Agreement when it was made, there is no question that the Wachovia Swap Agreement was made by the Debtor for the express purpose of complying with section 5.12 of the Credit Agreement. Moreover, the Wachovia Swap Agreement even specifically referred to the Credit Agreement, thereby showing both the Debtor's and Wachovia's intention that the Wachovia Swap Agreement be secured by the first lien granted to the First Lien Lenders. Therefore, Wachovia asserts that it holds a secured claim entitled to share pari passu in the first lien granted by the Debtor to the First Lien Lenders by the Security Agreement. Second, Wachovia argues that even if the obligations of the Debtor to Wachovia under the Wachovia Swap Agreement were not originally secured by the first lien granted by the Debtor under the Security Agreement at the time when the Wachovia Swap Agreement was first made, those obligations later became secured by the first lien granted by the Debtor under the Security Agreement on April 25, 2008 when Wachovia took the assignment from Goldman of $1,000,000 of the indebtedness owing by the Debtor under the Credit Agreement. Even though this assignment occurred post-petition, Wachovia asserts that this does not render it somehow improper because the Wachovia Swap Agreement is entitled to the "special protections" afforded to swap agreements under the Bankruptcy Code.

In reply, the Steering Committee first argues that a careful review of the definitional sections of the Credit Agreement and Security Agreement demonstrates that the Wachovia Swap Agreement

-10-

is not a "Hedge Agreement" under the Credit Agreement and therefore any obligations of the Debtor to Wachovia under Wachovia Swap Agreement are not entitled to share pari passu in the first lien granted to the First Lien Lenders by the Credit Agreement and Security Agreement. Second, the Steering Committee says that it is irrelevant that the Debtor and Wachovia as between themselves may have agreed in the Wachovia Swap Agreement and their emails that the Debtor's obligations under the Wachovia Swap Agreement would be secured by the first lien of the First Lien Lenders because the First Lien Lenders were not party to the Wachovia Swap Agreement and therefore are not bound in any respect to its terms. Third, the Steering Committee argues that Wachovia's April 25, 2008 post-petition purchase of $1,000,000 of debt under the Credit Agreement did not somehow retroactively transform the Wachovia Swap Agreement from a pre-petition unsecured claim into a post-petition secured claim. Fourth, the Steering Committee argues that even if the Wachovia Swap Agreement was at one time a "Hedge Agreement," it lost its status as such when it was terminated by Wachovia on February 7, 2008. As a result, even if the Wachovia Swap Agreement had somehow previously qualified as an "Obligation" under the Credit Agreement, it no longer qualified after February 7, 2008 because the Wachovia Swap Agreement had now been terminated. Once it was terminated, the Wachovia Swap Agreement could not be a "Hedge Agreement" because it no longer offered the Debtor any interest rate protection. Instead, the Debtor and Wachovia entered into a novation consisting only of the Debtor's promise to pay Wachovia a fixed amount. Fifth, the Steering Committee argues that any "special protections" that the Bankruptcy Code affords to swap agreements are irrelevant to a determination of whether Wachovia holds a secured claim. Finally, the Steering Committee argues that Wachovia is now barred from asserting a secured claim because all of the Debtor's property that allegedly secured such claim has already been sold in a § 363 sale.

For all of these reasons, the Steering Committee contends any claim of Wachovia, other than the $1,000,000 assigned claim, is only an unsecured claim not entitled to share pari passu in the first lien granted under the Credit Agreement and the Security Agreement to the First Lien Lenders.

## IV. Applicable Legal Standards

### A. Allowance of Claims under § 502(a)

Under § 502(a) of the Bankruptcy Code, a claim, proof of which is filed under § 501, is "deemed allowed, unless a party in interest . . . objects." The filing of a properly executed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). Section 502(b) of the Bankruptcy Code provides that the Court after notice and hearing shall determine the amount of a claim as of the date of filing the petition and shall allow the claim in that amount unless one of nine statutory bases for disallowance is shown. Section 502(b) then sets forth the substantive grounds upon which an objection to claim may be filed. Among the grounds for disallowance under § 502(b) is the provision in § 502(b)(1) that a claim shall be disallowed if it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." The Steering Committee is a party in interest as the beneficial holders of a majority in principal amount of the First Lien Term Loans. No one has challenged its standing to object to Wachovia's claim. In this case, the Steering Committee is not objecting, at least at this time, to the amount of Wachovia's claim, but rather is objecting to its allowance as a secured claim.

### B. Procedural Posture

The procedure for the Court to employ to consider the Steering Committee's objection is set forth in Fed. R. Bankr. P. 3007. Fed. R. Bankr. P. 3007(a) provides that "an objection to the

-12-

allowance of a claim shall be in writing and filed." An objection to claim under Fed. R. Bankr. P. 3007, if not joined with a demand for relief of the kind specified in Fed. R. Bankr P. 7001, constitutes a contested matter that is governed by Fed. R. Bankr. P. 9014 . See Advisory Committee Notes to Fed. R. Bankr. P. 3007. The instant objection filed by the Steering Committee does not seek any relief that is set forth in Fed. R. Bankr. P. 7001. Therefore it constitutes a contested matter.

When an objection to claim is made, the party objecting to the claim bears the initial burden of producing sufficient evidence to rebut the prima facie effect of the proof of claim. In re Hughes, 313 B.R. 205, 208 (Bankr. E.D. Mich. 2004) (citations omitted). Once the objecting party produces facts sufficient to demonstrate that an actual dispute exists regarding the validity or amount of the claim, the burden of going forward shifts to the claimant to submit evidence to sustain the claim. Id. (citations omitted). Although the burden of going forward shifts during the claims objection process, the ultimate burden of persuasion is always on the claimant to establish entitlement to the claim. See Fed. R. Bankr. P. 3001(f). The burden of proof that the claimant must satisfy to establish a particular claim against the bankrupt estate is determined by non-bankruptcy law. 4 Collier on Bankruptcy, ¶ 502.02[3][f] (15th ed. rev. 2008).

## C. Summary Judgment Standard under Rule 56(c)

Pursuant to Fed. R. Bankr. P. 9014(c), a motion for summary judgment may be brought in a contested matter. Fed. R. Civ. P. 56(c) regarding summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

A "genuine" issue is present "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Berryman v. Reiger, 150 F.3d 561, 566 (6th Cir. 1998) (quoting Anderson, 447 U.S. at 248). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (citations omitted). In this case, the Steering Committee asserts that there are no genuine issues of material fact and that the Steering Committee is entitled to a determination as a matter of law that, except for $1,000,000, Wachovia's claim is not secured by the lien held by the First Lien Lenders.

### D. Interpretation of Contracts under New York Law

Both parties ask the Court to focus on the written documents. The Steering Committee and Wachovia agree on what the relevant documents are,[4] but they disagree strongly on what they mean.

---

[4] Both the Steering Committee and Wachovia provided select excerpts from the operative documents, all of which are in the Court file in their entirety and can be found as follows:

1. Credit Agreement (First Lien Term Loan Credit and Guaranty Agreement), docket #183, Supplemental Response of Pre-Petition First Lien Term Agent to Chrysler LLC's Motion for Relief from the Automatic Stay, Ex. B.
2. Security Agreement (Pledge and Security Agreement), docket #183, Supplemental Response of Pre-Petition First Lien Term Agent to Chrysler LLC's Motion for Relief from the Automatic Stay, Ex. C.
3. Intercreditor Agreement, docket #183, Supplemental Response of Pre-Petition First Lien Term Agent to Chrysler LLC's Motion for Relief from the Automatic Stay, Ex. D.
4. Wachovia Swap Agreement including the Schedule (ISDA Master Agreement), docket #3433, Response of Wachovia Bank to Preliminary Objection of the Steering Committee of First Lien Term Loan Lenders, Ex. 3.
5. Swap Transaction Confirmation, docket #3433, Response of Wachovia Bank to Preliminary Objection of the Steering Committee of First Lien Term Loan Lenders, Ex. 4.
6. Wachovia Proof of Claim #176 (including attachments).

The Steering Committee asserts that the operative contractual documents executed by the Debtor and the First Lien Lenders are clear and unambiguous on their face, and a review of their terms demonstrates that Wachovia does not hold a security interest to secure any of the Debtor's obligations to it under the Wachovia Swap Agreement, notwithstanding what Wachovia and the Debtor may have intended.  On the other hand, Wachovia contends that the terms of the documents demonstrate that the obligations under the Wachovia Swap Agreement are secured on a pari passu basis with the First Lien Lenders under the Credit Agreement and Security Agreement.  Before examining the specific language of the relevant documents and the parties' interpretations of them, it is important to first consider the appropriate legal standard that this Court must apply to them.

In the Credit Agreement and Security Agreement, pursuant to which the Debtor granted a lien to the First Lien Lenders, the parties expressly agreed to have their rights and obligations under the documents governed by, and construed in accordance with, the laws of the State of New York (see Credit Agreement, Section 11.14; Security Agreement, Section 11.2).  Similarly, Wachovia and the Debtor also expressly agreed to have New York law apply to the Wachovia Swap Agreement (see Schedule to Swap Agreement, Part 4.(h)).  Therefore, the Court must apply principles of contract construction in accordance with applicable New York law to consider the parties' positions.

Under New York law, "[t]he primary objective in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language they chose to use" in the written contract.  Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotation marks and citations omitted).  Only objective manifestations of intent are relevant.  Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997) (citation omitted).  "The secret or

---

7.      Declaration of Wachovia Bank, N.A. (Hindman declaration), docket #3434.

subjective intent of the parties is irrelevant." Id. In making this determination, the contract should be read as a whole and the intent gleaned from the express contract provisions. RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted).

If the language of a contract is ambiguous and susceptible to different interpretations, then the contract's meaning becomes an issue of fact. Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d at 1094. Contract terms are ambiguous where the terms suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997) (internal quotation marks and citation omitted). If the Court finds that the language of the contract is ambiguous, then the Court may accept any available extrinsic evidence to determine the meaning intended by the parties during the formation of the contract. Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir. 1992). If the Court must rely on extrinsic evidence to determine the intended meaning of the contract language, material questions of fact exist and summary judgment is not appropriate. Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005); Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990) .

On the other hand, under New York law, if the language of a contract is unambiguous, the Court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) (citations omitted). Where the language of the contract is clear and unambiguous, it presents a question of law for the Court to decide and summary judgment is appropriate.

-16-

<u>Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London</u>, 136 F.3d 82, 86 (2d Cir. 1998); <u>Postlewaite v. McGraw-Hill, Inc.</u>, 411 F.3d at 67 (citation omitted). Therefore, "only where the language *and* the inferences to be drawn from it are unambiguous" may the Court "construe the contract as a matter of law and grant summary judgment accordingly." <u>Cable Science Corp. v. Rochdale Village, Inc.</u>, 920 F.2d at 151. (emphasis in original) (citation omitted).

V. <u>Discussion</u>

The Wachovia Statement attached to Wachovia's proof of claim bases Wachovia's secured status entirely on the Security Agreement. The Security Agreement is the only document that contains a grant of a lien that is either mentioned in the Wachovia proof of claim or the Wachovia Statement or referenced in any way in any of the documents attached to the proof of claim. Therefore, the starting point to determine whether Wachovia holds an allowed secured claim is the Security Agreement.

What obligations of the Debtor are secured by the Security Agreement? To understand what obligations are secured by the Security Agreement requires a journey through its definitional provisions and through some definitions that it imports from the Credit Agreement. Section 3.1 of the Security Agreement explains what obligations are secured by the grant of the lien:

> **Security for Obligations**. This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof)), of all First Lien Term Loan Obligations of every Grantor (the **"Secured Obligations"**).

In the preamble to the Security Agreement, the Debtor is defined as the "Grantor" and

-17-

Goldman is defined as the "Collateral Agent" for the "Secured Parties." Section 2.1 of the Security Agreement contains the actual grant of the lien by the Debtor to the "Collateral Agent," to hold solely for the "Secured Parties." "Secured Parties" is defined in the Security Agreement as follows:

> "**Secured Parties**" shall mean each holder of a First Lien Term Loan Obligation, including, without limitation, First Lien Term Loan Representatives, the Agents, Lenders and the Lender Counterparties and shall include, without limitation, all former Agents, Lenders and Lender Counterparties to the extent that any First Lien Term Loan Obligations owing to such Persons were incurred while such Persons were Agents, Lenders or Lender Counterparties and such Obligations have not been paid or satisfied in full.

Therefore, in order for Wachovia to have its claim allowed as a secured claim secured by the Security Agreement, it must demonstrate both that: (1) the obligations of the Debtor to Wachovia under the Wachovia Swap Agreement are "First Lien Term Loan Obligations" as defined in the Security Agreement; and (2) Wachovia is a "Secured Party" because it is the holder of a "First Lien Term Loan Obligation" owing by the Debtor to Wachovia that was "incurred while" Wachovia was an "Agent, Lender or Lender Counterparty." The Court will turn first to the issue of whether the obligations owing under the Wachovia Swap Agreement are "First Lien Term Loan Obligations" and then turn next to whether such "First Lien Term Loan Obligations" were "incurred while" Wachovia was an "Agent, Lender or Lender Counterparty."

The phrase "First Lien Term Loan Obligations" used in Section 3.1 of the Security Agreement is defined as follows:

> "**First Lien Term Loan Obligations**" shall mean, without duplication, (i) all First Lien Term Loan Obligations (as defined in the Intercreditor Agreement) and (ii) all Obligations (as defined in the Credit Agreement).

In the Wachovia Statement, Wachovia points to this definition and asserts that the Wachovia Swap Agreement qualifies under this definition because it is an "Obligation" as defined in the Credit

Agreement. (Wachovia does not assert that the Wachovia Swap Agreement is a "First Lien Term Loan Obligation" because of the definitional provisions in the Intercreditor Agreement but relies solely upon the definitional provisions in the Credit Agreement. Therefore, the Court need not discuss the definitional provisions in the Intercreditor Agreement.)

The Credit Agreement defines "Obligations" as follows:

> "**Obligations"** means all obligations of every nature of each Credit Party, including obligations from time to time owed to the Agents (including former Agents), the Lenders or any of them and Lender Counterparties, under any Credit Document or Hedge Agreement, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

Although admittedly not a party to either the Credit Agreement or the Security Agreement when they were made, Wachovia urges the Court to find that the Wachovia Swap Agreement is within the definition of "Obligations" in the Credit Agreement because the Wachovia Swap Agreement is a "Hedge Agreement." This assertion is pivotal. If the Wachovia Swap Agreement is a "Hedge Agreement," then it may qualify as an "Obligation" under the Credit Agreement and may well be a "First Lien Term Loan Obligation" under the Security Agreement.

"Hedge Agreement" is defined in the Credit Agreement as follows:

> "**Hedge Agreement**" means an Interest Rate Agreement or a Currency Agreement entered into with a Lender Counterparty in order to satisfy the requirements of this Agreement or otherwise in the ordinary course of Borrower's or any of its Subsidiaries' businesses.

This definition appears to have three components. First, to be a "Hedge Agreement" an agreement must be of a certain substance. Second, it must be an agreement entered into with a "Lender Counterparty." Third, it must be an agreement entered into to satisfy the requirements of the Credit

Agreement or otherwise entered in the ordinary course of the Debtor's business.

The first element of a "Hedge Agreement" is met by the Wachovia Swap Agreement. The Steering Committee does not dispute that the Wachovia Swap Agreement is in substance the type of agreement that qualifies as an "Interest Rate Agreement" as that term is defined in the Credit Agreement:

> "**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Borrower's and its Subsidiaries' operations and not for speculative purposes.

The third element of a "Hedge Agreement" is also met. The Steering Committee does not dispute that the Wachovia Swap Agreement was entered into by the Debtor with Wachovia to satisfy the requirement under section 5.12 of the Credit Agreement that the Debtor obtain interest rate protection.

The second element of the definition of "Hedge Agreement" presents the most difficult element in this case. The definition of "Hedge Agreement" does not include just *any* "Interest Rate Agreement" entered into by the Debtor to satisfy section 5.12 of the Credit Agreement. Instead, it only includes an "Interest Rate Agreement" entered into by the Debtor to satisfy section 5.12 *if* the counterparty to such "Interest Rate Agreement" also happens to be a "Lender Counterparty." To state it another way, if the Debtor enters into an "Interest Rate Agreement" to satisfy section 5.12 of the Credit Agreement, but the counterparty to that "Interest Rate Agreement" does not also happen to be a "Lender Counterparty," then the subject agreement does not qualify as a "Hedge Agreement" as defined by the Credit Agreement. If such "Interest Rate Agreement" is not a "Hedge Agreement" under the Credit Agreement, then it necessarily follows that it does not qualify as a

"First Lien Term Loan Obligation" under the Security Agreement. The relevant question then becomes whether Wachovia was a "Lender Counterparty."

To understand exactly who is a "Lender Counterparty" requires resort to yet other definitional sections of the Credit Agreement. "Lender Counterparty" is defined in the Credit Agreement as follows:

> "**Lender Counterparty**" means each Lender or any Affiliate of a Lender counterparty to a Hedge Agreement (including any Person who is a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender) including, without limitation, each such Affiliate that enters into a joinder agreement with Collateral Agent.

In the phrase "Lender counterparty," the Court reads the use of "counterparty," with a small "c," in the ordinary sense of a counter signatory to an agreement, i.e., a "Lender" or an "Affiliate of a Lender" that is a counterparty to a "Hedge Agreement." So this definition has two basic components. To be a "Lender Counterparty" one must first be either a "Lender" or an "Affiliate of a Lender." Even if one is a "Lender" or an "Affiliate of a Lender" that entity is still not a "Lender Counterparty" unless the entity is also a counterparty to a "Hedge Agreement."

The definition of "Lender Counterparty" then requires a threshold showing that Wachovia is either a "Lender" or an "Affiliate of a Lender." Naturally, each of those terms is also defined in the Credit Agreement:

> "**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

> "**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or

-21-

more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

Wachovia does not contend that it was listed on the signature pages of the Credit Agreement when it entered into the Wachovia Swap Agreement. Nor does it contend that it had taken any "Assignment Agreement" at that time. Clearly then, when the Wachovia Swap Agreement was made on March 19, 2007, Wachovia was not a "Lender." Further, Wachovia also concedes that it was not an "Affiliate of a Lender" when it entered the Wachovia Swap Agreement on March 19, 2007. Since it was neither a "Lender" nor an "Affiliate of a Lender" at the time that it entered the Wachovia Swap Agreement on March 19, 2007, Wachovia does not qualify as a "Lender Counterparty" under the Credit Agreement. Because of this fact, the Wachovia Swap Agreement, although itself qualifying within the definition of an "Interest Rate Agreement," simply was not a "Hedge Agreement" under the Credit Agreement when it was executed on March 19, 2007. Because the Wachovia Swap Agreement was not a "Hedge Agreement," any claim of Wachovia under the Wachovia Swap Agreement is not an "Obligation" within the Credit Agreement. Because it is not an "Obligation" under the Credit Agreement, it also necessarily follows that the Wachovia Swap Agreement is not a "First Lien Term Loan Obligation" under the Security Agreement. If it is not a "First Lien Term Loan Obligation" under the Security Agreement, then the Debtor's obligations to Wachovia under the Wachovia Swap Agreement are not secured by the Security Agreement. Therefore, unless Wachovia somehow subsequently became a "Lender Counterparty" to a "Hedge Agreement," its claim under the Wachovia Swap Agreement is unsecured and the Steering Committee's objection must be sustained.

In fact, Wachovia does assert that it subsequently became a "Lender" when it took an

assignment from Goldman of $1,000,000 of debt under the Credit Agreement on April 25, 2008. Wachovia argues that even if it did not previously qualify as a "Lender" and "Lender Counterparty," the assignment of the $1,000,000 of debt on April 25, 2008 indisputably made Wachovia a "Lender" at that time. According to Wachovia, because it attained the status of a "Lender" at that time, and because it was already a counterparty to an "Interest Rate Agreement," Wachovia therefore became a "Lender Counterparty" at that time and the Wachovia Swap Agreement then qualified as a "Hedge Agreement." As a "Hedge Agreement," the Wachovia Swap Agreement now qualified as an "Obligation" under the Credit Agreement and as a "First Lien Term Loan Obligation" under the Security Agreement.

The Steering Committee refutes this argument by insisting that there is a *temporal* requirement that is reflected in the definition of "Hedge Agreement" and the definition of "Lender Counterparty." The Steering Committee contends that an "Interest Rate Agreement" only qualifies as a "Hedge Agreement" if the counterparty (i.e., the other party) to the "Interest Rate Agreement" is a "Lender" at the time that the "Interest Rate Agreement" is entered into. This is because the definition of "Hedge Agreement" itself requires that the "Interest Rate Agreement" must be "entered into with a Lender Counterparty," meaning that the "Lender Counterparty" status must already exist when the "Interest Rate Agreement" is made. The Steering Committee goes on to argue that the grant of the lien by the Credit Agreement and the Security Agreement is only for the benefit of those counterparties to an "Interest Rate Agreement" who also happen to be "Lenders" at the time that the "Interest Rate Agreement" is entered into. If the counterparty to an "Interest Rate Agreement" is not a "Lender" at the time that the "Interest Rate Agreement" is entered into, then the "Interest Rate Agreement" is not a "Hedge Agreement," the obligations under it are not "Obligations" under the

Credit Agreement and, therefore, are not "First Lien Term Loan Obligations" secured by the Security Agreement. According to the Steering Committee, because Wachovia was not a "Lender" *when it entered* into the Wachovia Swap Agreement on March 19, 2007, its subsequent attainment of "Lender" status on April 25, 2008 is irrelevant.

Further, the Steering Committee points to the definition of "Lender Counterparty," specifically the parenthetical in it that states that "Lender Counterparty" includes "any Person who is a Lender . . . as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be a Lender . . . ." The Steering Committee argues that a "Lender Counterparty" specifically includes a *forme*r "Lender," but does not include a party who *subsequently* becomes a "Lender," *unless* that party had purchased term loan debt through an Assignment Agreement before or concurrent with becoming a counterparty to an "Interest Rate Agreement." In other words, the omission of a party in the position of Wachovia, (i.e., purchasing term loan debt through an Assignment Agreement after entering into an "Interest Rate Agreement"), was intentional. If the "Interest Rate Agreement" was already entered into by the Debtor with a counterparty that was not a "Lender," the subsequent attainment of "Lender" status by such counterparty does not enable the counterparty to somehow elevate the "Interest Rate Agreement" into a "Hedge Agreement" after the fact. Wachovia contends that these provisions are at best ambiguous and do not clearly set forth clearly a temporal requirement so that the Court should consider the intentions of the parties in further proceedings.

The Court agrees with the Steering Committee that there is a temporal requirement in the definition of "Hedge Agreement." An "Interest Rate Agreement" is only a "Hedge Agreement" if the counterparty to it is a "Lender" (and therefore a "Lender Counterparty") *when* the "Interest Rate

Agreement" is made.

In addition, there is also a provision in the Security Agreement that contains a plain and unambiguous temporal requirement. As explained earlier in this opinion, in order for Wachovia to prevail, it must demonstrate that the Wachovia Swap Agreement falls within the definition of "First Lien Term Loan Obligations" in the Security Agreement. But, as also explained earlier in this opinion, there is a second requirement that Wachovia must demonstrate. The second requirement is that Wachovia must also be within the definition of "Secured Parties" contained in the Security Agreement because the Security Agreement is unambiguous in only granting the lien to the "Collateral Agent" for the benefit of "Secured Parties." As noted above, the definition of "Secured Parties" in the Security Agreement plainly and unambiguously states that "Secured Parties" are holders of "First Lien Term Loan Obligations," but only "to the extent that any First Lien Term Loan Obligations owing to such Persons were incurred while such Persons were Agents, Lenders, or Lender Counterparties." There is no question of fact regarding the time when the Wachovia Swap Agreement was entered into – March 19, 2007. Wachovia was not a "Lender" under the Credit Agreement on that date. Therefore, Wachovia could not be a "Secured Party" on the date that the Debtor incurred its obligations under the Wachovia Swap Agreement. Nor was Wachovia a "Lender" on February 7, 2008, the date that the Wachovia Swap Agreement was terminated and the Debtor became obligated to pay the termination fee of $21,794,000. Wachovia only became a "Lender" on April 25, 2008, long after any of the Debtor's obligations to Wachovia under the Wachovia Swap Agreement were incurred. The fact that Wachovia subsequently became a "Lender" on April 25, 2008, did not operate to bring it within the definition of "Secured Parties" under the Security Agreement.

To recap, the Court holds that there is a temporal element in the definition of "Hedge Agreement" that requires that a party to an "Interest Rate Agreement" must also be a "Lender" at the time that the "Interest Rate Agreement" is made to qualify it as a "Hedge Agreement." Further, the grant of the lien in the Security Agreement also embodies this temporal requirement: the lien is held by the "Collateral Agent" for the benefit of the "Secured Parties." To qualify as a "Secured Party," Wachovia must show both that it is the holder of a "First Lien Term Loan Obligation" under the Security Agreement, and that such "First Lien Term Loan Obligation" was "*incurred while*" Wachovia was a "Lender." Even accepting as true every fact set forth in the Wachovia Statement and every fact set forth in the declaration filed by Hindman in support of Wachovia's reply to the Steering Committee's objection, it is undisputed that Wachovia was not a "Lender" when the Wachovia Swap Agreement was made and the Wachovia Swap Agreement was not a "First Lien Term Loan Obligation" that was "incurred while" Wachovia was a "Lender" or "Lender Counterparty." Therefore, under the plain and unambiguous language of the Credit Agreement and Security Agreement, the Wachovia Swap Agreement is not a "Hedge Agreement" and Wachovia just does not qualify as a "Secured Party."

Wachovia urges the Court to consider the fact that the Debtor and Wachovia obviously intended to have the Wachovia Swap Agreement be made part of the "Obligations" in the Credit Agreement secured by the Security Agreement. A review of the Wachovia Swap Agreement, the Schedule to it, the Wachovia Statement, the Hindman declaration, and the other documents attached to Wachovia's proof of claim, certainly support Wachovia's contention that Wachovia and the Debtor wanted the Wachovia Swap Agreement to be secured by the lien granted under the Security Agreement to the First Lien Lenders. But the intent of the Debtor and Wachovia, memorialized only

-26-

in the agreements as between themselves, to have the Wachovia Swap Agreement secured by the Security Agreement, does not and cannot override the plain terms of the Credit Agreement and the Security Agreement. The Credit Agreement expressly required the Debtor to enter into an "Interest Rate Agreement." The Credit Agreement and the Security Agreement made it clear that if the "Interest Rate Agreement" was entered into with a "Lender," then the counterparty to such "Interest Rate Agreement" would qualify as a "Lender Counterparty" and the "Interest Rate Agreement" would therefore qualify as a "Hedge Agreement." The Debtor's obligations under the "Hedge Agreement" would then come within the scope of the "Obligations" under the Credit Agreement and within the scope of the "First Lien Term Loan Obligations" under the Security Agreement. Moreover, a plain reading of the Security Agreement also demonstrates that the protections of the Security Agreement extended only to those holders of "First Lien Term Loan Obligations" where the "First Lien Term Loan Obligations" were "*incurred while*" the holders were "Lenders" or "Lender Counterparties." If Wachovia was not a "Lender" at the time that the Wachovia Swap Agreement was made, it could not be a "Lender Counterparty," the "Interest Rate Agreement" was not a "Hedge Agreement," and the Debtor's obligations under the Wachovia Swap Agreement were not secured by the Security Agreement. The fact that Wachovia later became a "Lender" did not mean that the pre-existing obligations under the Wachovia Swap Agreement were now retroactively converted from unsecured obligations to secured obligations. The key moment in time under the Credit Agreement and Security Agreement was when the obligations under the Wachovia Swap Agreement were incurred and the undisputed fact is that Wachovia was not a "Lender" at that time.

-27-

## VI.  Conclusion

Because the Court finds the language of the written contracts to be unambiguous, the Court

is able to construe the contracts as a matter of law.  Further, in the circumstances of this case, where

the contracts are plain and unambiguous, the Court cannot consider extrinsic evidence to alter or

interpret their meaning.  Wachovia places much reliance on the exchange of emails quoted above

as demonstrating the intent of the parties.  Those communications show concern about Wachovia's

secured status, and may evidence a meeting of the minds between the Debtor and Wachovia that

Wachovia would hold a secured interest in the Debtor's assets.  But that evidence of intent between

Wachovia and the Debtor cannot act to rewrite the unambiguous agreement between the Debtor and

the First Lien Lenders.  The Court is "required to give effect to the contract as written and may not

consider extrinsic evidence to alter or interpret its meaning."  Consarc Corp. v. Marine Midland

Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993) (citations omitted).  Based on the unambiguous

language of the operative documents between the Debtor and the First Lien Lenders, the Steering

Committee is entitled to have its objection sustained as a matter of law, and the $21,794,000 claim

of Wachovia disallowed as a secured claim under § 502(b)(1) of the Bankruptcy Code because the

claim is unenforceable as a secured claim against the Debtor and property of the Debtor.  The Court

will allow the balance of the claim of Wachovia as a secured claim in the amount of $1,000,000.

The parties raised other arguments in support of their positions.  Wachovia's brief in

opposition to the Steering Committee's objection discussed at length what Wachovia considers to

be the "special protections" provided by the Bankruptcy Code for swap agreements.  In particular,

Wachovia cited to the definition of a swap agreement in § 101(53B), the exception to the automatic

stay under § 362(b)(17) for certain acts by a swap participant, and various other Bankruptcy Code

-28-

sections.  However, Wachovia's arguments regarding these special protections are not relevant. Irrespective of any special protections afforded by the Bankruptcy Code to swap agreements, a careful review of the documents provided by Wachovia and the Steering Committee to the Court, as well as the Wachovia Statement and the Hindman declaration, persuade the Court that there is no genuine issue of material fact regarding whether Wachovia's claim should be allowed as a secured claim.  The Court concludes that Wachovia's claim for $21,794,000 is not a secured claim. Any special protections that the Bankruptcy Code affords to swap agreements do not rescue Wachovia from this conclusion.  It is therefore unnecessary for the Court to discuss in detail the Bankruptcy Code special protections identified by Wachovia for swap agreements.

It is likewise unnecessary for the Court to consider the Steering Committee's contention that the Wachovia Swap Agreement no longer constituted an "Interest Rate Agreement" once it was terminated on February 7, 2008, or the Steering Committee's assertion that the conduct of Wachovia and the Debtor at that time constituted a novation.  Again, the salient point is that the Debtor's obligations to Wachovia under the Wachovia Swap Agreement and to pay the termination fee were, unfortunately for Wachovia, not secured by the lien granted to the "First Lien Lenders" by the "Security Agreement."  The Court also need not address the Steering Committee's assertion that Wachovia's alleged failure to participate in the credit bid at the § 363 sale of the Debtor's assets somehow precludes Wachovia from now holding a secured claim.  The Court agrees that Wachovia does not hold a secured claim (other than for $1,000,000), but the reason for that conclusion is that the Court is persuaded that under the plain language of the Credit Agreement and the Security Agreement, the Debtor's obligations to Wachovia were not secured by the grant of the lien by the Debtor to the First Lien Lenders.  Finally, given the Court's finding that Wachovia's claim (except

for $1,000,000) is not secured by the lien granted to the First Lien Lenders, the Court need not address an additional legal question raised by the Steering Committee pertaining to whether the Bankruptcy Code permits a creditor post-petition to elevate a pre-petition unsecured claim to a secured claim.

The Court will enter an order sustaining the Steering Committee's preliminary objection and holding that all of Wachovia's claim is an unsecured claim except for $1,000,000.

**FOR PUBLICATION**

Signed on December 04, 2008

                                              /s/ Phillip J. Shefferly
                                        Phillip J. Shefferly
                                        United States Bankruptcy Judge

-30-