UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Plastech Engineered Products, Inc., et al.[1]       Case No. 08-42417
                                           Chapter 11
                 Debtors.                     Hon. Phillip J. Shefferly

                                                        Jointly Administered

_____/

**OPINION OVERRULING DEBTOR'S OBJECTIONS
TO CERTAIN SECTION 503(b)(9) CLAIMS BASED
UPON DEBTOR'S ASSERTION THAT SUCH CLAIMS
<u>ARE FOR SERVICES AND NOT FOR GOODS</u>**

I. <u>Introduction</u>

This Chapter 11 case involves many issues arising under § 503(b)(9), which was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The Court has already ruled on a number of these legal issues and has more awaiting it.[2] This opinion addresses the Debtor's objections to five specific § 503(b)(9) administrative expense claims filed by four separate claimants. Section 503(b)(9) gives administrative expense priority to a claim for "the value of any goods received by the debtor within 20 days before" the petition date. 11 U.S.C. § 503(b)(9).

---

[1] The Debtors are the following entities: Plastech Engineered Products, Inc., LDM Technologies, Inc., Plastech Frenchtown, Inc., Plastech Decorating Systems, Inc., Plastech Exterior Systems, Inc., Plastech Romulus, Inc., MBS Polymet, Inc., LDM Holding Canada, Inc. and LDM Holding Mexico, Inc.

[2] On September 16, 2008, the Court issued its opinion determining that § 502(d) does not apply to administrative expenses under § 503(b)(9) (docket entry #2929) and on October 7, 2008, the Court issued its opinion sustaining in part the Debtor's objection to Vivitar Inc.'s motion for allowance of administrative expense under § 503(b)(9) (docket entry #3175).

There are two legal issues involved here: (1) whether each of these four claimants delivered "goods" to the Debtor as required in order to have an allowed § 503(b)(9) claim; and (2) in the case of one of these claimants, where the alleged "goods" consist of natural gas, whether the claimant is precluded from a § 503(b)(9) claim because of the provisions of § 366 of the Bankruptcy Code regarding "utility service." The Debtor's objections to all of these claims were heard by the Court on October 22, 2008. At the conclusion of the hearing, the Court took the Debtor's objections under advisement. By agreement of the parties on the record, the Court is only ruling on these specific legal issues and is not ruling on any other objections that the Debtor may have to the § 503(b)(9) claims filed by these four claimants. For the reasons set forth in this opinion, the Court has determined to overrule in part the Debtor's objections.

## II. Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## III. Facts

On February 1, 2008, Plastech Engineered Products, Inc. and a number of related entities filed for relief under Chapter 11 of the Bankruptcy Code (Plastech and its related entities are collectively referred to as the "Debtor"). Prior to filing Chapter 11, the Debtor was engaged in business as a tier one automotive supplier, designer and maker of blow-molded and injection-molded plastic products. After filing its Chapter 11 petition, the Debtor filed a motion seeking the entry of an order fixing a bar date and setting forth a procedure to file requests for administrative expense payments under § 503(b)(9) of the Bankruptcy Code. On April 18, 2008, the Court entered an order (docket entry #1083) granting the Debtor's motion and establishing both a bar date and a procedure

for filing § 503(b)(9) claims. After the Court entered this order, many § 503(b)(9) claims were filed. Among the § 503(b)(9) claims filed are the five that are the subject of this opinion. They are as follows:

| Name of Claimant | Claim No. | Amount of Claim |
|---|---|---|
| American Turf Care ("American Turf") | 1828 | $ 12,713.00 |
| Geo-Tech Polymers, LLC ("Geo-Tech") | 1624 | 153,639.00 |
| Spina Electric Company ("Spina") | 572 | 3,317.40 |
| Spina | 574 | 7,177.00 |
| Lakeshore Energy Services, LLC ("Lakeshore") | 615 | 73,503.81 |

On August 11, 2008, the Debtor filed its eighth omnibus objection to § 503(b)(9) claims (docket entry #2453). That same day, the Debtor filed its ninth omnibus objection to § 503(b)(9) claims (docket entry #2454). Both the Debtor's eighth and ninth omnibus objections sought to reclassify various § 503(b)(9) claims into general unsecured non-priority claims. The basis for both the eighth and ninth omnibus objections is that the claims identified in those objections should not be allowed under § 503(b)(9) because they did not arise from the delivery of "goods" to the Debtor, but instead arose from the delivery of "services" by such claimants to the Debtor. The eighth omnibus objection included the Debtor's objections to the § 503(b)(9) claims of American Turf, Geo-Tech and Lakeshore. The Debtor's ninth omnibus objection included its objection to the two § 503(b)(9) claims of Spina.

The Debtor's eighth and ninth omnibus objections were originally scheduled for hearing on September 12, 2008, and then adjourned to October 8, 2008. Because it appeared that there were disputed issues of fact between the Debtor and certain of these claimants, the Court adjourned the hearing on the Debtor's objections until October 22, 2008, so that an evidentiary record could be made before the Court ruled on each of these objections. At the hearing on October 22, 2008, the

Debtor requested and the § 503(b)(9) claimants agreed that the record made that day would only be for the purpose of enabling the Court to decide whether or not these four claimants had delivered "goods" as required by § 503(b)(9). In addition, in the case of Lakeshore, the record would also serve to enable the Court to determine whether § 366 of the Bankruptcy Code somehow prevents Lakeshore from having an allowed § 503(b)(9) claim. Any other objections that the Debtor may have to the claims of these four claimants (e.g., amount) were reserved by agreement of the parties.

At the October 22, 2008 hearing, the first objection heard was with respect to the claim of American Turf. American Turf called two witnesses in support of its claim. The first witness was William Walter Root III. Root testified that he is one of two partners in American Turf and that American Turf is engaged in the business of removing snow, salting, de-icing, mowing, and landscaping. Root testified that American Turf entered into a contract with the Debtor pursuant to which American Turf plowed snow, applied salt and applied de-icer during the winter of 2007-2008 for the Debtor at its various plants. Root testified that American Turf would plow the snow and then apply chloride and salt to the sidewalks, loading docks and parking lots. Its contract with the Debtor required both the removal of snow and the sale of chloride and salt. The Debtor did not specify the type of chloride or salt to apply. American Turf determined what kind and how much of the chloride and salt to apply. According to Root, American Turf billed separately for the plowing, de-icer and salt used, as required under the Debtor's purchase orders. American Turf's second witness was Christopher Scheich, the other partner in American Turf. His testimony was similar to Root's testimony. On cross examination, he acknowledged that American Turf was not in the business of selling salt in bulk to the public, but instead brought salt and de-icer by truck to its customers to apply after removing snow from the sidewalks and parking lots.

American Turf also introduced into evidence a copy of its proof of claim dated May 30, 2008, together with 16 separate invoices dated from January 15, 2008 through January 28, 2008. Each of the invoices broke down by specific amount the charges for snow removal and the charges for application of chloride and salt. On each invoice, there is an "Item Code" that indicates whether the charge is for "salting" or "snow." The "Description" of each charge stated on each invoice then explains whether the particular charge is for shoveling or clearing off snow (i.e., "snow") or for applying chloride or salt (i.e., "salting"). Of American Turf's total § 503(b)(9) claim of $12,688, the invoices clearly break out the sum of $2,400 for shoveling, removing and otherwise clearing snow, and break out the balance of the charges of $10,288 for applying chloride and salt.[3] The only witness called by the Debtor was James Carroll, who is the chief liquidation officer of the Debtor. Carroll did not dispute any of the testimony by Root or Scheich but testified he had reviewed the documents that were attached to American Turf's § 503(b)(9) claim.

After the Court heard the testimony regarding American Turf's § 503(b)(9) claim, the Court next heard testimony regarding Geo-Tech's § 503(b)(9) claim. Geo-Tech called one witness, Ken Heater. Heater testified that he is an owner and officer of Geo-Tech and that Geo-Tech is in the business of applying certain technologies to process materials and create and sell goods from those materials. Heater testified that Geo-Tech sold thermaplastic polyolefin ("TPO") pellets to the Debtor, which the Debtor used to make automotive bumpers and facia panels. According to Heater, the raw material used by Geo-Tech to make the TPO pellets for the Debtor consisted of the Debtor's

---

[3] American Turf's proof of claim was for $12,713. At the evidentiary hearing, counsel for American Turf explained that there was a mathematical error in the claim. The sum for shoveling and removing snow was overstated by $25 and should be $2,400 instead of the $2,425 shown on the proof of claim.

-5-

own post-industrial scrap. Heater explained that if, during the Debtor's quality control process, a bumper made by the Debtor was found to be defective, the Debtor would scrap that bumper. The bumpers would then be ground up by the Debtor for disposal. As part of its contract with the Debtor, Geo-Tech would collect that waste material from the Debtor and bring it back to Geo-Tech's facilities. Geo-Tech would then test and segregate the raw material. Once it received a purchase order from the Debtor, Geo-Tech would then use the raw material to manufacture TPO pellets. The manufacturing process included de-coating, filtration and testing, so that each batch met the Debtor's production specifications. Not all of the Debtor's waste was used by Geo-Tech, and Geo-Tech was not paid by the Debtor for the amount of waste that it converted into raw material for the TPO pellets it sold to the Debtor. Instead, Geo-Tech charged the Debtor and the Debtor agreed to pay for finished product TPO pellets made by Geo-Tech and sold to the Debtor by Geo-Tech on a per pound basis. Geo-Tech would have charged a higher price for the TPO pellets it delivered to the Debtor if Geo-Tech had bought the raw material on the open market. According to Heater, the Debtor could have substituted prime resin for the finished TPO pellets in making its automotive bumpers and facia panels. However, the cost of the recycled pellets was significantly less than the cost of prime resin.

Geo-Tech introduced three exhibits in support of its § 503(b)(9) claim. Exhibit 1 is a physical exhibit consisting of a sampling of the post-industrial waste from the Debtor that Geo-Tech utilizes as raw material in the manufacture of the TPO pellets. Exhibit 2 is another piece of physical evidence consisting of a sampling of the finished product TPO pellets sold by Geo-Tech to the Debtor. Exhibit 3 consists of Geo-Tech's proof of claim dated May 29, 2008, together with a package of supporting documents including purchase orders and invoices dated from January 14, 2008 through January 31, 2008. The invoices from Geo-Tech to the Debtor describe a "Part No."

as "Decoat & Pelletize." The "Product Description" portion of the invoice refers to "Part #" and "Lot." The invoices go on to provide for a quantity of parts per pound and a price list for the parts per pound. The only witness called by the Debtor regarding Geo-Tech's § 503(b)(9) claim was Carroll whose testimony with respect to Geo-Tech was similar to his testimony with respect to American Turf.

The Court next heard the Debtor's objection to Spina's two § 503(b)(9) claims. The Debtor and Spina agreed that there are no genuine issues of fact and therefore no evidence was adduced at the hearing on October 22, 2008, regarding the Debtor's objection to Spina's two § 503(b)(9) claims. The Debtor and Spina agreed that the Court could make its decision based upon a review of the two proofs of claims, the parties' briefs, and the attachments to each of them. The first claim for $3,317.40 states on the invoice that it is for "DISMANTLE, CLEAN, INSPECT, REPAIR PER QUOTE, ASSEMBLE, TEST & PAINT." The second claim for $7,177 also states on the invoice that it is for "DISMANTLE, CLEAN, INSPECT, REPAIR PER QUOTE, ASSEMBLE, TEST & PAINT." The descriptions on each of these two invoices appear at first blush to all be for services, but Spina also provided the Court with an affidavit of Timothy Spina, the vice president of Spina (Ex. B to Spina's response to Debtor's objections) (docket entry #3106). The affidavit explains that the attachments to it are "Job Cost Detail Reports" and that they "reflect the amount of goods (material) provided to Debtor and the amount of labor charged in connection with such goods." The affidavit goes on to explain in paragraph 9 that Spina's "assignment from Debtor was to make the electric motors at issue work and to obtain such parts as were necessary to make these motors work . . . and, as a review of the Job Cost Detail Report reflects, the work provided was predominantly providing parts." The "Job Cost Detail Report" for Spina's $3,317.40 claim breaks that claim down

-7-

between "labor" of $375 and "materials" of $2,942.40. Similarly, the "Job Cost Detail Report" for Spina's $7,177 claim breaks that claim down between "direct labor" of $787.50 and "materials" of $6,389.50.

Finally, the Court heard the Debtor's objection to Lakeshore's § 503(b)(9) claim**.** There are no disputed issues of fact regarding it. Lakeshore provided the Debtor with natural gas and its § 503(b)(9) claim is based entirely upon the delivery of natural gas.

IV. Positions of the Parties

In its written objections to each of the five § 503(b)(9) claims before the Court, the Debtor argues that none of the claimants delivered "goods" to the Debtor and therefore they are not entitled to a § 503(b)(9) claim. The Debtor correctly observes that the Bankruptcy Code does not contain a definition of "goods." The Debtor urges the Court to construe the term "goods" narrowly and to adopt the definition of "goods" contained in the Uniform Commercial Code and then apply that definition to the five claims before the Court. The Debtor next argues that if any of the claimants entered into a transaction with the Debtor that has a mixture of goods and services, the Court should apply what is known as the "predominant purpose" test, which has been developed by some courts for various non-bankruptcy purposes including whether an agreement is one for the sale of goods under the Uniform Commercial Code or for other areas of law such as tax law or products liability law. The Debtor provides the Court with numerous authorities articulating the predominant purpose test and argues that if it is applied to the claims of American Turf, Geo-Tech and Spina, the Court will conclude that each of those transactions had as its predominant purpose the delivery of services and not goods, and therefore those claimants are not entitled to a § 503(b)(9) claim. The Debtor requests that the Court adopt an "all or nothing" approach where there is a mixture of goods and

services, so that if the predominant purpose is found to be the delivery of goods, then the entire claim may be allowed under § 503(b)(9). On the other hand, if the predominant purpose is found to be the delivery of services, then the entire claim must be disallowed under § 503(b)(9). Finally, at the October 22, 2008 hearing, the Debtor conceded that although natural gas may be within the Uniform Commercial Code definition of "goods," Lakeshore is not entitled to a § 503(b)(9) claim because it is a provider of utility service and therefore is limited to the rights and remedies afforded to utility service providers under § 366 of the Bankruptcy Code.

American Turf, Geo-Tech and Spina do not quarrel with the Debtor's assertion that the Uniform Commercial Code definition of "goods" should be utilized. However, they do take issue with the Debtor's "all or nothing" approach and assert that they are entitled to a § 503(b)(9) claim for the value of *any* "goods" they have delivered, even if their respective agreements with the Debtor may have also included the delivery of some services to the Debtor. American Turf, Geo-Tech and Spina next argue that if the Court does determine to apply a predominant purpose test, then the predominant purpose shown by the evidence was in fact the acquisition of a product, rather than the acquisition of a service. For its part, Lakeshore asserts simply that there is nothing in the rights conferred by § 366 that makes those rights mutually exclusive of the rights that § 503(b)(9) affords to one who has sold "goods" to the Debtor.

V. <u>Analysis</u>

Section 503(b)(9) reads as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title including –
. . .
(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such

-9-

debtor's business.

The first issue for the Court to decide is what constitutes "goods" under § 503(b)(9). The Bankruptcy Code does not define "goods" and there is no controlling case law construing the term as it is used in this section of the Bankruptcy Code. The Court is aware of only two other Bankruptcy Court decisions regarding the meaning of "goods" in § 503(b)(9). In In re Samaritan Alliance, LLC, No. 07-50735, 2008 WL 2520107 (Bankr. E.D. Ky. June 20, 2008), the creditor sought allowance of an administrative expense claim for the value of electricity provided to the debtor during the 20 days before the bankruptcy case was filed. The debtor argued that the creditor provided "services" and not "goods" as required by § 503(b)(9). The creditor pointed to a number of state law decisions under non-bankruptcy law such as products liability law, that found that electricity is considered a product rather than a service. The debtor countered by arguing that electricity does not constitute "goods" under the Uniform Commercial Code because it is not specifically identifiable before it passes through a meter. Noting that the courts are divided on the general issue of whether electricity constitutes goods, the court found the debtor's argument more compelling, holding that for purposes of § 503(b)(9), electricity is "more properly characterized as a 'service.'" Id. at *4. As a result, the court disallowed the creditor's § 503(b)(9) request.

In another unreported decision, In re Deer, No. 06-02460, slip op. at 2 (Bankr. S.D. Miss. June 14, 2007) (Debtors' Eighth Omnibus Objection, Ex. D, docket entry #2453), the debtor purchased advertising from Yellow Book, which filed a § 503(b)(9) claim. The court first noted the absence of a definition of "goods" in the Bankruptcy Code. The court then applied the Uniform Commercial Code definition of "goods," concluding that "advertising does not constitute a good as defined by Article 9" nor a "sale of goods under Article 2" of the Uniform Commercial Code. Id.

at 4 (citations omitted). In addition, the court also observed that § 503(b)(9) was adopted to "operate[ ] in conjunction with [ ] § 546(c)(2) to provide administrative expense treatment to a creditor with reclamation rights even if the seller fails to make a demand." Id. (citations omitted). However, Yellow Book had "made no assertion that it would be entitled to exercise reclamation rights" with regard to the advertising it had sold to the debtor. Id. The court concluded that Yellow Book "seemingly has misconstrued the underlying purpose of § 503(b)(9)," and disallowed the claim. Id. at 4-5.

In addition to the Samaritan Alliance and Deer courts' reliance on Uniform Commercial Code definitions, treatises that have commented on this issue have also suggested that the Uniform Commercial Code definitions are appropriate to use under § 503(b)(9). For example, Collier on Bankruptcy states:

> The scope of section 503(b)(9) is limited solely to goods. Claims for services and claims for personal property other than goods are outside the scope of section 503(b)(9). Goods is not defined in the Code and so the definition used in Article 2 of the Uniform Commercial Code is likely to be used.

4 Collier on Bankruptcy, ¶ 503.16[1], 503-79 (15th ed. rev. 2008).

Absent a definition in the Bankruptcy Code or in controlling case law, the Court is persuaded that the best definition for "goods" is the definition provided by the Uniform Commercial Code. The Michigan Commercial Code defines "goods" as follows:

> (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 2107).
>
> (2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported

-11-

present sale of future goods or of any interest therein operates as a contract to sell.

(3) There may be a sale of a part interest in existing identified goods.

Mich. Comp. Laws Ann. § 440.2105(1)-(3).

Before applying the Uniform Commercial Code definition of "goods" to the § 503(b)(9) claims of American Turf, Geo-Tech, Spina and Lakeshore, the Court will first address the Debtor's assertion that in the instance of a mixture of goods and services, the Court must apply a predominant purpose test and that the result of such application is a "winner take all." Neibarger v. Universal Cooperatives, Inc., 486 N.W.2d 612 (Mich. 1992) involved an action brought by dairy farmers for negligence and products liability against designers and sellers of an allegedly defective milking system to recover damages resulting from injury to cows and decreased milk production. One of the issues was whether the Uniform Commercial Code applied to this transaction such that its statute of limitations would be applicable. In order to resolve that issue, the court had to determine whether this contract, which undeniably involved a mixture of sales of goods and sales of services, should be treated as a contract for the sale of goods under the Uniform Commercial Code.

The Michigan Supreme Court adopted the predominant purpose test, finding it both the "majority view" and "the most logical approach . . . ." Id. at 621. The Neibarger court expressed the test as follows:

> "The test for inclusion or exclusion is not whether [the contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involve[d] . . . or is a transaction of sale, with labor incidentally involved . . . ."

Id. at 621 (quoting Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974)). The Neibarger court went on to explain that

> [a] court faced with this issue should examine the purpose of the dealings between

the parties. If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required. Conversely, if the purchaser's ultimate goal is to procure a service, the contract is not governed by the UCC, even though goods are incidentally required in the provision of this service.

Id. at 622.

Applying the test, the Neibarger court concluded that the transaction in that case was a contract for the sale of goods and therefore governed by the Uniform Commercial Code. Id. at 622-23; see also Busch v. Dyno Nobel, Inc., No. 00-1808, 40 Fed. Appx. 947, 954-55, 2002 WL 1608340 (6th Cir. July 18, 2002) (recognizing that Michigan law uses the predominant purpose test).

The predominant purpose test applies where there is a mixture of goods and services *and* where there is also a need to categorize the transaction as *either* a sale of goods or not. There are instances under non-bankruptcy law, such as the Uniform Commercial Code, products liability law or tax law, where a court must decide whether a particular contract either is a sale of goods or is not a sale of goods for purposes of determining whether to apply a particular body of law. The issue in Neibarger was whether the particular contract was either all fish or all fowl. In other words, the court was required to find that the subject contract was either a contract for the sale of goods or not. In that context, the Debtor's "winner takes all" approach is both logical and necessary. But there is nothing in § 503(b)(9) that requires that approach for the purposes of that section of the Bankruptcy Code. If a particular transaction provides for *both* a sale of goods and a sale of services, and the value of each of them can be ascertained, why shouldn't the value of the goods be entitled to the § 503(b)(9) administrative expense priority and the value of the services be relegated to an unsecured non-priority claim? There may well be sound policy reasons for not distinguishing between the sale of goods and the sale of services to a debtor within 20 days before bankruptcy, but

-13-

that is just what § 503(b)(9) does. In drawing that line, this Court does not have to reach a determination as to whether the sales by American Turf, Geo-Tech and Spina would be considered sales of goods for purposes of the Uniform Commercial Code, products liability law, or tax law, under a predominant purpose test. Under § 503(b)(9), that determination is irrelevant. The only relevant determination under § 503(b)(9) is the value of the "goods" that were delivered, irrespective of whether the contract also called for the delivery and sale of services. The predominant purpose test does not inform the Court as to whether a particular thing that has been sold is or is not "goods." Therefore, the predominant purpose test is unnecessary. There is nothing in § 503(b)(9) that dictates the use of a "winner take all" approach. Accordingly, the Court rejects the Debtor's contention that the predominant purpose test must be applied to the claims of American Turf, Geo-Tech and Spina.

The Debtor urges the Court to adopt the predominant purpose test because it will avoid expensive, fact intensive inquiries in ascertaining the value of those items that are goods versus those items that are services in the case of contracts containing a mixture of goods and services. The Debtor also correctly points out that most contracts for the sale of goods themselves involve some degree of manufacturing or other processes. The Court agrees that it may be difficult in many cases to separate the components of a contract that represent the value of services from the components of the contract that represent the value of goods. But that is the directive of § 503(b)(9). There is nothing in § 503(b)(9) that somehow disqualifies a § 503(b)(9) claim just because the contract pursuant to which the goods were sold also provides for the sale of services. The Court agrees that the adoption of a predominant purpose test might in some instances eliminate fact intensive evidentiary hearings. But efficiency considerations do not trump the plain language of the statute. See Chrysler Corp. v. Commissioner, 436 F.3d 644, 654 (6th Cir. 2006) ("[L]egislative intent should

-14-

08-42417-pjs    Doc 4082    Filed 12/10/08    Entered 12/10/08 16:48:39    Page 14 of 18

be divined first and foremost from the plain language of the statute. If the text of the statute may be read unambiguously and reasonably, our inquiry is at an end.").

Likewise, there is no basis to import a requirement that the goods be reclaimable, as argued by the Debtor. Congress added § 503(b)(9) to the Bankruptcy Code as part of § 1227 of BAPCPA, entitled "Reclamation." Most of BAPCPA § 1227 is devoted to amending § 546 of the Bankruptcy Code, which provides relief to sellers of goods who failed to give an effective notice for reclamation. The Debtor reads this scant legislative history as an indication that § 503(b)(9) is a reclamation concept, and suggests that goods must be reclaimable in order for a seller to have a § 503(b)(9) claim. However, there is nothing in § 503(b)(9) that requires a claimant to also be entitled to a reclamation right under § 546. Section § 546 does not limit or control in any way the rights that a claimant has under § 503(b)(9).

Having decided the proper test to apply, the relevant question then is whether American Turf, Geo-Tech and Spina delivered *any* "goods" to the Debtor within 20 days before its Chapter 11 petition. The evidence shows that each of them did. A review of American Turf's invoices shows that it sold both goods and services to the Debtor. Fortunately, its invoices also demonstrate that the value of the goods that it sold and the value of the services that it sold to the Debtor are each readily calculable. The services that American Turf sold to the Debtor total an aggregate value of $2,400. They consist of shoveling, removing and clearing snow from loading docks, sidewalks and parking lots. On the other hand, the invoices show that charges for salt and chloride are also readily calculable. Their value adds up to $10,288. Salt and chloride de-icer are within the definition of "goods" in the Uniform Commercial Code. The fact that the American Turf contract with the Debtor provided for a mixture of goods and services does not create any difficulty for the Court in

this case because all of the charges are separately broken out. Because § 503(b)(9) awards the administrative expense for the value of *any* goods, and does not require that a transaction be made up entirely or even predominantly of goods versus services, the Court concludes that the Debtor's objection to American Turf's § 503(b)(9) claim should be sustained only as to $2,400 for services, and denied as to the balance of American Turf's § 503(b)(9) claim.

Much like American Turf's § 503(b)(9) claim, Spina's § 503(b)(9) claims are also broken out between goods and services. The "Job Cost Detail Report" for claim #572 shows that of its total of $3,317.40, the sum of $2,942.40 is for materials and the sum of $375 is for labor. The fact that the materials consist of parts does not alter their character. They are still "goods" within the Uniform Commercial Code definition. Therefore, with respect to claim #572, the Debtor's objection is sustained only with respect to the $375 shown on the invoice for "labor," and is denied with respect to the $2,942.40 shown on the invoice for "materials." Similarly, in claim #574, Spina requests allowance of $7,177. The "Job Cost Detail Report" for that claim shows that the sum of $6,389.50 is for "materials" and $787.50 is for "labor." The "labor" does not constitute goods. The "materials" do. Therefore, the Debtor's objection is sustained with respect to the $787.50 amount for "labor" and is denied as to the balance.

The Court also finds that the Debtor's objection to Geo-Tech's § 503(b)(9) claim must be denied. The evidence demonstrates that Geo-Tech sold "goods" to the Debtor. The "goods" consisted of the TPO pellets. It is true that some degree of service went into the manufacture of those goods. It is also true that Geo-Tech acquired the raw material to manufacture those goods from the Debtor itself. But neither of those facts alters the fundamental nature of the TPO pellets themselves as goods under the Uniform Commercial Code definition of "goods." Because the Court

concludes that the TPO pellets themselves are "goods," Geo-Tech is entitled to a § 503(b)(9) claim for their value. The only evidence of value in the record is the invoice amount and, therefore, Geo-Tech's § 503(b)(9) claim is allowed in the invoice amount of $153,639.00.

The final issue before the Court pertains to Lakeshore. Lakeshore and the Debtor agree that natural gas constitutes "goods" for purposes of the Uniform Commercial Code. Therefore, the only question is whether there is something about the existence of § 366 that precludes Lakeshore from having a § 503(b)(9) claim because it is a provider of a utility service. Just because a seller of goods may also be a utility that is entitled to the protections of § 366 for the sale of utility services post-petition to a debtor, does not mean that the provider of the utility service is prohibited from allowance of a § 503(b)(9) administrative expense claim to the extent that it has sold goods to the debtor pre-petition that otherwise qualify under § 503(b)(9). Section 503(b)(9) addresses the sale of goods pre-petition and § 366 addresses the provision of utility services post-petition. They are not mutually exclusive. One can be the seller of goods as defined in the Uniform Commercial Code entitling the seller to a § 503(b)(9) claim for the pre-petition sale of goods, and also simultaneously be entitled to the protections of § 366 with respect to the provision of utility services post-petition to a debtor. On the other hand, if the utility in question does not sell goods (e.g., natural gas), but instead is found to have sold services (e.g., electricity as in Samaritan Alliance, 2008 WL 2520107), then the seller of the services is not entitled to a § 503(b)(9) administrative expense priority because § 503(b)(9) only grants such priority with respect to the value of goods and not with respect to the value of services. In sum, the Court rejects the notion that the rights of a § 503(b)(9) administrative expense claimant are somehow limited or controlled by § 366. The rights afforded by § 503(b)(9) to a seller of goods are not dependent either explicitly or implicitly upon either the availability or

the lack of availability of other remedies under the Bankruptcy Code for such seller.

## VI. Conclusion

The Court overrules the specific objections of the Debtor addressed in this opinion as to the claims of Geo-Tech and Lakeshore, and overrules in part the specific objections to the claims of American Turf and Spina. This opinion does not preclude the Debtor from asserting any other objections that it has made and preserved with respect to the allowance of the five claims discussed in this opinion. The Court will enter separate orders regarding the Debtor's objections to these claims consistent with this opinion.

FOR PUBLICATION

**Signed on December 10, 2008**

                                                              **/s/ Phillip J. Shefferly**
                                                              **Phillip J. Shefferly**
                                                              **United States Bankruptcy Judge**